**UNITED STATES of America, Plaintiff-Appellee,**

v.

**SPAWR OPTICAL RESEARCH, INC., a corporation, Walter J. Spawr and Frances A. Spawr, individuals, Defendants-Appellants.**

**No. 81–1078.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1981.

Decided Aug. 24, 1982.

As Amended on Denial of Rehearing and Rehearing En Banc Nov. 10, 1982.

William A. Dougherty, Tustin, Cal., for defendants-appellants.

Theodore Wai Wu, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

---

Before CHOY and NELSON, Circuit Judges, and INGRAM,* District Judge.

CHOY, Circuit Judge:

Walter and Frances Spawr and their family-owned corporation, Spawr Optical Research, Inc. (the Spawrs), appeal their convictions resulting from their unlicensed export of laser mirrors destined for the Soviet Union.[1] Their principal challenge is to the Government's reliance on allegedly defunct export regulations that they were convicted of violating. They also allege that government misconduct prejudiced their defense, that the trial court erred by admitting co-conspirators' statements that lacked a proper evidentiary base, and that, in any event, the evidence was insufficient to support the convictions.[2] We find all of these contentions unpersuasive.

## I. *Background*

In 1969, Frances and Walter Spawr formed Spawr Optical Research, Inc., as a means of exploiting Walter's skills as an optics expert. Walter served as president, Frances as secretary-treasurer, and together with a third individual they constituted

---

* The Honorable William A. Ingram, United States District Judge for the Northern District of California, sitting by designation.

1. A federal grand jury indicted the Spawrs and the corporation for misrepresenting shipment values in Shipper's Export Declarations submitted to the U. S. Customs Service, a violation of 18 U.S.C. § 1001 (1976) (Counts 1–6); conspiracy to export without a license, a violation of 18 U.S.C. § 371 (1976) (Count 10); and exporting laser mirrors to Germany and Switzerland with the knowledge that the mirrors would be shipped to the Soviet Union, a violation of export administration regulations as authorized by the Export Administration Act of 1969, Pub.L.No.91–184, 83 Stat. 841 (1969) (current version at 50 U.S.C. app. §§ 2401 et seq. (Supp. III 1979)) (Counts 7–9), by the Trading with the Enemy Act, 50 U.S.C. app. § 5(b) (1976) (current version at 50 U.S.C. app. § 5(b) (Supp. III 1979)), and by Executive Order No. 11940, 3 C.F.R. 150 (1976 compilation), *reprinted at* 50 U.S.C. app. § 2403 (1976) (Counts 11–14).

After a 13-day trial, the jury found the corporation guilty on all of the charges (Counts 1–14), convicted Frances and Walter on both the conspiracy and substantive exporting charges

as to the second Russian order (Counts 10–14), and convicted Frances on the false representation charges (Counts 1–6). The court denied the Spawrs' motions for acquittal and for a new trial, sentenced the corporation to pay fines totaling $100,000, and placed Walter and Frances on probation for five years under various terms and conditions, including required community service, with the stipulation that Walter serve the first six months of his sentence in a jail-type institution.

2. The Spawrs raise additional challenges to their convictions for the first time in their reply brief and in subsequent letters to this court. As a general rule, we will not consider an issue raised for the first time in a reply brief. *McCall v. Andrus*, 628 F.2d 1185, 1187 (9th Cir. 1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1700, 68 L.Ed.2d 197 (1981). Appellants offer no valid reason why their challenges should escape the general rule. We need not address whether abatement is a jurisdictional question that may be raised at any time because, pursuant to the general savings statute, 1 U.S.C. § 109, abatement does not apply here. Therefore, the Spawrs are foreclosed from raising the new challenges at this time.

the corporation's board of directors. While operating out of the Spawr home, Walter invented a superior process for polishing laser optics and mirrors. By 1975, the Spawrs were in commercial operation and had developed a client list that included universities, industrial users of lasers, defense subcontractors, and government defense agencies.

As the Spawrs began to explore international markets in 1974, they established a business arrangement with Wolfgang Weber, a West German national, calling for Weber to promote and distribute Spawr mirrors in Central and Eastern Europe, including the Communist Block nations. Weber, who was named an unindicted coconspirator with the Spawrs, arranged and facilitated the two orders of laser mirrors which underlie the Spawrs' convictions.

In October 1975, Spawr provided Weber with sample laser mirrors to exhibit at a trade show in Moscow. The laser mirrors attracted considerable interest and in January 1976 Weber obtained the Spawrs' authorization to accept an order for mirrors from a purchasing agency of the Soviet Government. When Weber visited California in late spring of 1976, the Spawrs provided him with some of the mirrors for the order. In July, the Spawrs shipped the balance of the order to Weber in West Germany. Weber then forwarded the entire order to Moscow. In the shipping documents accompanying the mirrors, Frances listed the value of each mirror at $500. The Spawrs never attempted to obtain a validated export license for the mirrors exported for this first order.

In April 1976, Weber notified Spawr that he had received a second Soviet order for Spawr mirrors. Walter told Weber that he thought it might be better to ask for an export license for at least a part of this order. Weber then provided Walter with an end-user statement. On May 4, 1976, Walter filed an application with the Commerce Department for a validated export license for some of the mirrors by the Soviets. The Commerce Department denied the application on October 7, 1976 pursuant to Executive Order 11940 and existing export regulations, because the mirrors were found to have "significant strategic applications" posing a potential threat to national security. Weber sent a letter cancelling the second Soviet order on November 3, 1976 after Spawr informed him that the application had been denied. In February 1977, however, Spawr shipped mirrors to a freight forwarder in Switzerland. Weber then relabeled the boxes containing the mirrors and shipped them to Moscow. The shipping documents accompanying the mirrors again stated that the value of each mirror did not exceed $500.

## II. The Validity of the Export Regulations

In light of the pending expiration of the Export Administration Act of 1969 (EAA),[3] President Gerald Ford issued Executive Order No. 11940[4] on September 30, 1976 to maintain the EAA regulations forbidding the shipment of specified strategic items to certain foreign countries. He acted pursuant to § 5(b) of the Trading with the Enemy Act (TWEA), 50 U.S.C. app. §§ 1–44. When the Order was issued and while it remained in effect, the TWEA empowered the President, during a presidentially-declared national emergency, to "regulate, ... prevent or prohibit ... any exportation of ... or transactions involving any property in which a foreign country ... has any interest." *Id.* at § 5(b)(1)(B).[5] Rather than declare a new national emergency to support the Executive Order, President Ford relied on the continued existence of national emergencies declared in 1950 by President Truman relating to the Korean War and in 1971 by President Nixon con-

---

**3.** Pub.L.No.91–184, 83 Stat. 841 (1969) (current version at 50 U.S.C. app. §§ 2401 *et seq.* (Supp. III 1979)).

**4.** 3 C.F.R. 150 (1976 compilation), *reprinted in* 50 U.S.C. app. § 2403 (1976).

**5.** Section 5(b) was later amended to eliminate all reference to "national emergency." *See* Act of Dec. 28, 1977, Pub.L.No.95–223, §§ 101(a), 102, 103(b), 91 Stat. 1625, 1626 (1977) (codified at 50 U.S.C. app. § 5(b) (Supp. III 1979).

cerning an international monetary crisis. *See* Exec. Order No. 11940, 3 C.F.R. 150 (1976 compilation), *reprinted in* 50 U.S.C. app. § 2403 (1976).

The laser mirrors for the first Russian order were exported before the EAA expired on October 1, 1976, and the Spawrs do not dispute the Government's authority to prosecute them for exporting mirrors to fill the first Soviet order. The Spawrs exported laser mirrors for the second Soviet Order, however, after the EAA had expired and before it was reenacted on June 22, 1977,[6] when the sole basis for the regulations was the Executive Order. The Spawrs assert that the Order did not preserve the export regulations and, therefore, the Government lacked authority to prosecute them for their exporting mirrors for the second Soviet orders because: (1) there was no genuine national emergency, (2) the regulations were not rationally related to any emergency then in existence, and (3) the lapse of the EAA shows that Congress intended to terminate the regulations.[7]

■ Former section 5(b) of the TWEA delegated to the President broad and exten-

sive powers; "it could not have been otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress." *United States v. Yoshida International, Inc.*, 526 F.2d 560, 573 (Cust. & Pat.App.1975) (footnote omitted). Wary of impairing the flexibility necessary to such a broad delegation, courts have not normally reviewed "the essentially political questions surrounding the declaration or continuance of a national emergency" under former § 5(b). *Id.* at 579.[8] The statute contained no standards by which to determine whether a national emergency existed or continued; in fact, Congress had delegated to the President the authority to define all of the terms in that subsection of the TWEA including "national emergency," as long as the definitions were consistent with the purposes of the TWEA. 50 U.S.C. app. § 5(b)(3). In the absence of a compelling reason to address the difficult questions concerning the declaration and duration of a national emergency under former § 5(b), we decline to do so.[9]

---

**6.** *See* Export Administration Amendments of 1977, Pub.L.No.95–52, 91 Stat. 235 (1977) (current version at 50 U.S.C. §§ 2401 *et seq.* (Supp. III 1979)). On July 7, 1977, the September 1976 Order was revoked by Executive Order No. 12002, 3 C.F.R. 133 (1977 compilation), *reprinted in* 50 U.S.C. app. § 2403 (Supp. I 1977).

**7.** The Spawrs also argue that they were denied due process because they did not have fair notice that the specific conduct was forbidden. *See United States v. Bishop*, 555 F.2d 771, 777 (10th Cir. 1977). The Spawrs, however, had actual notice of the proscribed conduct. Walter Spawr had been in contact with the Department of Commerce throughout the summer of 1976 when the license application was pending and was told not to ship the mirrors without a license. Frances Spawr was obviously aware of the regulations because she directed an employee to undervalue the mirrors specifically to avoid the required license. The applicable export regulations reissued under Executive Order No. 11940 were identical to those pursuant to which the defendants submitted their application. Under these circumstances, a person of ordinary intelligence would have been given fair notice that the contemplated conduct was forbidden. *Id.*

**8.** Since the 1975 decision of the Court of Custom and Patent Appeals in *Yoshida*, Congress has eliminated all references to a national emergency in § 5(b), *see supra* note 5; and has established procedures for declaring and terminating a national emergency. *See* The National Emergencies Act, Pub.L. 94–412, 90 Stat. 1255 (1976), codified at 50 U.S.C. § 1601–41 (1976). We need not decide how these changes might affect the reviewability of the above issues.

**9.** A decision to review the duration of the national emergencies involved here, however, would probably not help the Spawrs. This court has previously commented that the national emergencies relied on in this case were terminated effective September 14, 1978 *only* by operation of the National Emergencies Act of 1976, 50 U.S.C. § 1601. *Cornet Stores v. Morton*, 632 F.2d 96, 97 (9th Cir. 1980), *cert. denied*, 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981). The legislative history of the Act of Dec. 28, 1977, *see supra* note 5, also indicates that Congress believed that these national emergencies remained in effect until the enactment of the National Emergencies Act. *See* S.Rep.No.466, 95th Congress, 1st Sess. 2, *reprinted in* 1977 U.S.Code Cong. & Ad.News 4540, 4541. Moreover, the National Emergencies Act plainly states that the termination of

■ Although we will not address these essentially-political questions, we are free to review whether the actions taken pursuant to a national emergency comport with the power delegated by Congress. *See Yoshida*, 526 F.2d at 579.[10] The standard proffered by the Spawrs is that the President's action must be rationally related to the national emergencies invoked. Assuming, without deciding, that the Spawrs are correct, we believe that there is a rational relationship.

One source invoked by President Ford was Presidential Proclamation No. 2914. It declared a national emergency based in part on events which "imperil the efforts of this country and those of the United Nations to prevent aggression and armed conflict." 3 C.F.R. 99, 100 (1949–53 compilation). President Ford's effort to limit the exportation of strategic items clearly had a rational relationship to the prevention of aggression and armed conflict.

■ The Spawrs' final argument, that Congress intended to terminate these export regulations by allowing the EAA to lapse, is rebutted by presidential and congressional actions taken concerning the EAA. The EAA had previously lapsed three times. In each instance, the President used an executive order virtually identical to Executive Order No. 11940 to maintain the export regulations.[11] All three orders relied upon the same unrevoked decla-rations of national emergencies and upon § 5(b) of the TWEA.

Congress not only tolerated this practice, it expressed approval of the President's reliance on the TWEA to maintain the export regulations. In passing the 1977 amendments to the EAA, Congress again conferred on the President the rule-making authority necessary to maintain the regulations. The legislative history of the 1977 amendments indicates that the reenactment of § 5(b) "reflected concern for preserving existing regulation imposed under emergency authority, including ... the transaction control regulations, which prohibit U. S. persons from participating in shipping strategic goods to ... the Soviet Union." S.Rep.No.466, 95th Cong., 1st Sess. 3, *reprinted in* 1977 U.S.Code Cong. & Ad.News 4540, 4542.[12]

Moreover, the EAA apparently was allowed to lapse only because Congress could not resolve questions relating to the anti-boycott provisions. *See Arab Boycott Hearings on S. 69 and S. 92, Before the Subcommittee on International Finance of the Senate Committee on Banking, Housing and Urban Affairs*, 95th Congress, 1st Sess. 1 (Senator Stevenson) (1977). The Spawrs have offered no evidence that Congress intended to dismantle the export controls.

In conclusion, even under the demanding scrutiny the Spawrs argue is appropriate because of the criminal nature of this case,

the emergencies would not affect any actions taken or penalties incurred prior to the 1978 expiration date. 50 U.S.C. § 1601(a)(2), (3).

10. As noted previously, the express delegation in § 5(b) to the President was broad and enabled him to regulate, prevent or prohibit the exportation of *any* property to *any* foreign country. The unambiguous wording of the statute clearly shows that the President's actions were in accordance with the power Congress delegated. *Cf. United States v. Yoshida International, Inc.*, 526 F.2d 560, 573 (Cust. & Pat.App.1975) (that President can regulate imports is incontestable under language of § 5(b)).

11. *See* Exec. Order No. 11810, 3 C.F.R. 905 (1971–75 compilation) (covering 29-day lapse; revoked by Exec. Order No. 11818, 3 C.F.R. 924 (1971–75 compilation)); Exec. Order No. 11796, 3 C.F.R. 888 (1971–75 compilation) (cov-ering 14-day lapse; revoked by Exec. Order No. 11798, 3 C.F.R. 890 (1971–75 compilation)); Exec. Order No. 11677, 3 C.F.R. 719 (1971–75 compilation) (covering 28-day lapse; revoked by Exec. Order No. 11683, 3 C.F.R. 724 (1971–75 compilation)).

12. *See also* Emergency Controls on International Economic Transactions: Hearings on H.R. 1560 and H.R. 2382 Before the Subcommittee on International Economic Policy and Trade of the House Committee on International Relations, 95th Congress, 1st Sess. 30 (1977). During one hearing concerning the presidential use of the TWEA, Congressman Bingham observed: "One of the reasons why the Export Administration Act has been allowed to expire so many times is because there was [the TWEA] ...." *Id.* at 136.

it is unmistakable that Congress intended to permit the President to use the TWEA to employ the same regulatory tools during a national emergency as it had employed under the EAA. We, therefore, conclude that the President had the authority during the nine-month lapse in the EAA to maintain the export regulations.

### III. *Alleged Misconduct*

The Spawrs also argue that the district court denied them a fair trial by not granting their motions to dismiss the indictments or to order a new trial because of prosecutorial misconduct. The Spawrs allege three instances of misconduct: a failure to return subpoenaed documents, an impermissible interference with a defense witness, and a televised interview with the prosecutor.

■ If sufficiently severe, prosecutorial misconduct may justify either remedy sought by the Spawrs. *See United States v. Samango*, 607 F.2d 877, 884–85 (9th Cir. 1979). In judging the severity of the alleged misconduct, we must determine whether prosecutorial misconduct occurred, whether the issue of misconduct was properly preserved for appeal, and whether the defendants were actually prejudiced by the misconduct. *United States v. Berry*, 627 F.2d 193, 196–97 (9th Cir. 1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981).

■ The Spawrs allege that they submitted some exculpatory documentary evidence pursuant to government subpoenaes, but the Government failed to return it. The Spawrs, however, have made no factual showing, apart from a self-serving assertion by Walter Spawr in an affidavit supporting a motion to dismiss, that the prosecution refused to disclose documents within its possession. In fact, the record indicates that the Spawrs did not fully comply with the grand jury's subpoenaes. Thus, the first requirement of the *Berry* test has not been satisfied.

■ The Spawrs' bare assertions that the conduct of a Department of Defense (DOD) attorney impermissibly interfered with an expert witness and consequently denied them their right to compulsory process or to confront witnesses are without merit. While undergoing cross-examination, a witness for the Spawrs did consult with the DOD attorney, but he did so on his own initiative. The DOD attorney was not a member of the prosecution team: he attended the trial only to answer possible questions concerning classified information. His contact with the witness did not constitute interference. The DOD attorney did return to Washington, D. C., before completion of the trial, but the Spawrs have not shown how this action denied their right to compulsory process or to confront witnesses.

■ The Spawrs also failed to prove that they were prejudiced by a national broadcast shown on the first day of the jury deliberations. The broadcast consisted of an interview that had occurred nearly three months earlier in which one of the prosecutors spoke generally about the Government's investigations into export violations. The prosecutor simply stated his belief that American businessmen had indeed exported high-technology items to the Soviet Union; he did not mention the Spawrs or the laser mirror sales. The network, however, juxtaposed its statements with a film showing the Spawrs leaving the courthouse. The broadcast did not identify the Spawrs.

The prosecutor informed the court of the existence of the interview early in the proceedings. He also notified the court as soon as he learned the time the interview would be aired. Once the trial judge became aware of the news broadcast, he considered all the alternatives proposed by counsel, including sequestration of the jury, before specifically instructing the jury not to watch any news program on the particular television channel or to talk to anyone who might have. Absent a showing to the contrary, we assume that the jury followed the trial court's instructions. *Fineberg v. United States*, 393 F.2d 417, 419–20 (9th Cir. 1968) (jury is presumed to have conscientiously observed limiting instructions given by the court).

### IV. *The Co-conspirator's Statements*

The Spawrs next contend that the trial court should not have admitted the state-

ments of co-conspirators because the Government failed to establish the existence of a conspiracy. The district court admitted the challenged statements subject to a motion to strike if the Government failed to provide sufficient proof, a procedure we have upheld. *See United States v. Kenny*, 645 F.2d 1323, 1334 (9th Cir.), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981). The district court later determined that sufficient evidence had been introduced.

 To prove the existence of a conspiracy, the prosecution must establish a prima facie case through the introduction of substantial independent evidence other than the contested hearsay. *United States v. Perez*, 658 F.2d 654, 658 (9th Cir. 1981). The evidence need not compel finding the existence of a conspiracy beyond a reasonable doubt, and circumstantial evidence is often sufficient to establish the existence of a conspiracy. *Id.*

In this case, there is ample evidence independent of the conspirators' statements. The basic actions involved are undisputed. The Spawrs concede that they knew of the Soviet orders, that Walter Spawr signed the export license application relating to the second Soviet order, that Wolfgang Weber sent an end-user statement to Walter Spawr, that after the export license was denied the company continued to manufacture the mirrors to the specifications of the second Soviet order, that Frances Spawr furnished the valuations on the shipper's export declarations for both orders, that they shipped part of the first order and all of the second order of mirrors to West Germany and Switzerland, and that Weber later shipped the mirrors to Moscow. Weber's testimony on his own role in the conspiracy was not hearsay evidence, and it substantiates the existence of the conspiracy. There was more than sufficient evidence to establish a prima facie case.

V. *Other Issues*

We find the Spawrs' other contentions to be without merit. The evidence,

when viewed in the light most favorable to the Government, was sufficient to permit any rational trier of fact to find each of the defendants guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir. 1980). Inconsistency in the verdicts is not a ground for reversal, *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976), and is not probative here of the insufficiency of the government's evidence.

Finally, the district court did not err by instructing the jury to equate value of the lasers with the selling price in deciding whether the Spawrs had misrepresented facts in the Shipper's Export Declarations. The export regulations expressly equated value with the selling price when, as here, the goods were already sold when shipped. 15 C.F.R. § 30.7(q)(1) (1976). Moreover, a former Spawr employee testified that Frances intentionally understated the value in order to evade the export restrictions.

The convictions of Walter and Frances Spawr and of Spawr Optical are, therefore, AFFIRMED.