UNITED STATES of America, Plaintiff,

v.

Arnold I. MANDEL and Rona K. Mandel, Defendants.

No. CR S-87-198 LKK.

United States District Court,
E.D. California.

Aug. 29, 1988.

Thomas Flynn, Asst. U.S. Atty., Sacramento, Cal., for plaintiff.

Daniel F. Cook, Topel & Goodman, San Francisco, Cal., for defendant Arnold Mandel.

Dale A. Drozd, Blackmon & Drozd, Sacramento, Cal., for defendant Rona Mandel.

## ORDER

KARLTON, Chief Judge.

Defendants are charged with exporting certain types of high technology electronic equipment between the years 1982 and 1983, which appear on the Department of Commerce's Commodity Control List ("CCL") without first obtaining a validated export license in violation of 50 U.S.C. App. § 2410(a).[1] The matter is before me on a motion to dismiss the indictment and a mo-

tion to discover documents possessed by the Department of Commerce and the Department of Defense.[2] Both motions are premised upon the defendants' assertion that the Government must prove as an element of its case that the items defendants are accused of exporting without a license were properly placed on the CCL.

## I

### THE STATUTORY SCHEME

The Export Administration Act of 1979 (the "Act") provides the executive branch with power to impose export controls for reasons of national security, foreign policy or domestic short supply. 50 U.S.C. App. §§ 2402(2), (10) and 2404–06. These controls are implemented through licensing requirements for commodities which meet the criteria set forth in the Act.[3] The power to require export licenses for such commodities is vested in the Secretary of Commerce. 50 U.S.C. App. § 2403(a). It is the responsibility of the Secretary to establish and maintain a CCL of commodities subject to export controls under the Act. 50 U.S.C. App. §§ 2403(b), 2404(c).

The Act contains an elaborate set of criteria which govern the Secretary's imposition of export controls. Any reading of the statute demonstrates that its provisions reflect the tension which exists between a desire to control exports of strategic technology for security reasons on the one hand, and the economic needs of this country for foreign trade on the other.[4] As I

---

**1.** 50 U.S.C. App. § 2410(a) provides that "whoever knowingly violates any provision of this Act or any regulation, order, or license issued thereunder shall be fined not more than five times the value of the exports involved or $50,000, whichever is greater, or imprisoned not more than 5 years, or both."

**2.** Defendants originally sought to discover documents in the possession of various intelligence agencies. That request was denied in an unpublished order filed April 20, 1988.

**3.** The Secretary may require any of the following types of export licenses for commodities falling within the scope of the Act: (1) a validated license, authorizing a specific export, issued pursuant to an application by the exporter; (2)

a qualified general license, authorizing multiple exports, issued pursuant to an application by the exporter; (3) a general license, authorizing exports, without application by the exporter; and (4) such other licenses as may assist in the implementation of the Act. 50 U.S.C. App. § 2403(a).

**4.** The Congress has declared that: "(2) It is the policy of the United States to use export controls only after full consideration of the impact on the economy of the United States and only to the extent necessary—(A) to restrict the export of goods and technology which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States; (B) to re-

explain below, this tension is essentially resolved by providing the executive with the power to restrict exports, but only under fairly stringent standards. Ultimately, the motions at bar raise the question of whether a defendant in a criminal case accused of violating the provisions against export of items on the CCL without a license, may raise as a defense that the Secretary listed those items in violation of the statutory standards. Below, I sketch the general statutory scheme; in doing so, I resolve some peripheral issues of statutory interpretation which have divided the defendants and the Government.[5]

■ Section 2403 of 50 U.S.C. App. embodies the general provisions applicable to all types of controls. That section directs the Government to make a finding regarding the foreign availability of items before their exportation may be restricted. Relative to these provisions, the Government argues that 50 U.S.C. App. § 2403(c) does not require the Secretary to make a foreign availability determination *before* export controls are imposed. I must reject that argument. First, there is simply no basis for this interpretation in the language of section 2403(c) which provides that the Secretary "shall not impose export controls" on goods which he determines are available

without restriction from sources outside the United States.[6] Moreover, sections 2403(c) and 2404(c) and (f), *see infra*, at 509–10 and n. 11, must be read together, and the only way to do so is to interpret section 2403 as requiring an initial determination before controls may be imposed and section 2404 as requiring periodic review of the foreign availability determination. This reading is consistent with the Secretary's understanding of his obligations under the Act. *See* Export Administration Annual Reports Fiscal Years 1982 and 1983, at 13–15 and 17–18, respectively.[7] Under the statute then, *see* n. 6, the items listed in the indictment, if readily available from sources outside the United States, should not have been listed on the CCL, unless further determinations were made regarding foreign policy or national security implications.

■ In addition to the general requirements of section 2403, national security controls are subject to certain additional requirements.[8] The Secretary may impose national security controls on a commodity "only to the extent necessary ... (A) to restrict the export of goods and technology which would make a significant contribution to the military potential of any other

---

strict the export of goods and technology where necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations." 50 U.S.C. App. § 2402(2)(A) and (B).

**5.** Because these peripheral determinations seem relatively directly made from the language of the statute, I do not engage in the detailed sequential method of statutory construction which is ordinarily to be engaged in when seeking legislative intent. See section III–A, *infra*.

**6.** The statute reads: "FOREIGN AVAILABILITY. In accordance with the provisions of this Act, the President shall not impose export controls for foreign policy or national security purposes on the export from the United States of goods or technology which he determines are available without restriction from sources outside the United States in significant quantities and comparable in quality to those produced in the United States, unless the President determines that adequate evidence has been presented to him demonstrating that the absence of such controls

would prove detrimental to the foreign policy or national security of the United States." 50 U.S. C. App. § 2403(c).

**7.** Under the sequential system then, the court would find that the plain meaning of the statute, *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434 (1987), reading the provision in light of other provisions of the same statute, *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates*, — U.S. ——, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988), and the administrative interpretation of the provision, *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), all compel a finding that the Secretary shall make a finding relative to foreign availability before imposing export controls.

**8.** Although the Government initially asserted that validated export licenses were required for the items in question because of foreign policy and national security reasons, the Government now takes the position that these items were

country or combination of countries which would prove detrimental to the national security of the United States." 50 U.S.C. App. §§ 2402(2)(A), 2404(a)(1); *see also* 50 U.S.C. App. § 2403(d). Section 2404 imposes additional restraints on the Secretary's decision to impose national security export controls. Under section 2404(e)(2), the Secretary can require a validated export license for the export of goods and technology only if:

(A) the export of such goods or technology is restricted pursuant to a multilateral agreement, formal or informal, to which the United States is a party and, under the terms of such multilateral agreement, such export requires the specific approval of the parties to such multilateral agreement;

(B) with respect to such goods or technology, other nations do not possess capabilities comparable to those possessed by the United States; or

(C) the United States is seeking the agreement of other suppliers to apply comparable controls to such goods or technology and, in the judgment of the Secretary, United States export controls on such goods or technology, by means of such license, are necessary pending the conclusion of such agreement.

50 U.S.C. App. § 2404(e)(2). Defendants argue that subparagraphs (A) and (B) should be read in the conjunctive, i.e., that both subparagraphs must be satisfied before a validated license can be required. The court cannot agree. It is clear that the statute itself does not resolve the issue of whether (A) and (B) are to be read conjunctively or disjunctively. Moreover, the legislative history is also unilluminating. Binding authority, however, directs a means of construction of statutes presenting this form. In interpreting a similar statutory provision, the Ninth Circuit has held that when a series of items are presented in the form of a list and the only conjunction used is an "or" between the last two items, all of the items are to be read disjunctively. *Rose v. United States Postal Service,* 774 F.2d 1355, 1360–61 n. 14 (9th Cir.1984). Thus, although this section, like much of the Act, is far from a model of clarity, it appears that subparagraphs (A) and (B) ought to be read in the disjunctive.[9]

Section 2404 also provides for periodic review of the commodities subject to national security controls to insure that they continue to satisfy the conditions for imposition of export controls. Section 2404(c)(3) directs the Secretary to issue regulations providing for review, including a foreign availability determination, of items subject to national security controls at least every three years "in the case of controls maintained cooperatively with other countries, and annually in the case of all other controls, in order to carry out the policy set forth in section [2402(2)(A)] and the provisions of this section."[10] Items which require a validated export license are subject to stricter review with respect to foreign availability. The Secretary must review the foreign availability of such items on a continuing basis.[11]

---

subject only to national security controls. Government Brief, filed June 1, 1988, at 1.

**9.** An initial reading of subparagraphs (A) and (B) disjunctively (i.e., that a validated license may be required for any item agreed upon in multilateral negotiations) appears to raise a question as to whether or not there has been an unconstitutional delegation of authority to the Secretary, since it could be argued that there are no congressionally created standards limiting the Secretary's conduct. Upon further consideration, however, the question does not appear to be a substantial one. The Secretary must, in any case, find that the criteria set forth in sections 2403(c) and 2404(a)(1) both are met when "national security" is the justification for the listing of an item.

**10.** According to the Government, the items listed in the indictment are subject to multilateral controls and, therefore, must be reviewed every three years.

**11.** 50 U.S.C. App. § 2404(f)(1) provides that "The Secretary ... shall review, on a continuing basis, the availability, to countries to which exports are controlled under this section, from sources outside the United States, including countries which participate with the United States in multilateral export controls, of any goods or technology the export of which requires a validated license under this section. In any case in which the Secretary determines ... that any such goods or technology are available in fact to such destinations from such sources in sufficient quantity and of sufficient quality so

Having explicated the statutory scheme, I turn to the motions before me.

## II

## MOTION TO DISMISS

■ Because the Secretary's authority to impose export controls may not be exercised except to carry out the stated policies of the Act, 50 U.S.C. App. § 2403(d), defendants contend that the factors listed in section 2402(2)(A) and (B), *see* n. 4, must be satisfied before an item can be listed on the CCL. Defendants argue that since the Government has failed to allege that the conditions specified in that section exist, the indictment does not allege a crime and the indictment should be dismissed. As the court understands defendants' argument, it is that even if the items shipped were otherwise properly listed on the CCL, a crime would not be committed if, e.g., the goods would not make a "significant contribution to the military potential of any other country." Put another way, defendants contend that section 2402(2)(A) and (B) in that sense may be said to articulate additional elements of an offense.[12]

Defendants have offered no support for their assertion that the policy statements contained in section 2402 are standards, and that compliance with those standards must be alleged to successfully plead an offense under section 2410(a). Indeed, the three reported cases which have addressed this issue have rejected defendants' contention. *See United States v. Moller–Butcher*, 560 F.Supp. 550 (D.Mass.1983); *United States v. Gregg*, 829 F.2d 1430 (8th Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988), and *Spawr*

*Optical Research, Inc. v. Baldridge*, 649 F.Supp. 1366 (D.D.C.1986). As I explain in section III–A *infra*, there is much to be said for the proposition that these cases have failed to address fundamental questions concerning the proper relationship between administrative actions and the criminal law. Such considerations, however, are not directly pertinent to the issue at hand. Here, the narrow question is whether the policy considerations articulated by Congress as its motivation for passage of the Act constitute elements of the offense. Both the plain language of the statute and its structure strongly suggest otherwise.

The plain language of section 2402(2)(A) and (B) denotes that the section articulates the congressionally determined policy of the United States relative to export control. As such, the section may be important in interpreting whether particular decisions made by the Secretary are consistent with the statute, but a policy is just that—a policy, and thus is not in itself a mandatory standard. This section must be contrasted with sections 2403 and 2404, which command that items not be listed unless the criteria contained therein are met.[13] While the policy statements may aid the Secretary in determining whether in close cases the standards for listing have or have not been met, both the section's characterization of itself as an articulation of policy and its contrast with the mandatory character of sections 2403 and 2404 militate against a holding that section 2402(2)(A) and (B) was intended to express further elements of the offense. Thus, while this court is less than satisfied with the reasoning of the cases that have considered this matter, I join them in their result and,

that the requirement of a validated license for the export of such goods or technology is or would be ineffective in achieving the purpose set forth in subsection (a) of this section, the Secretary may not, after the determination is made, require a validated license for the export of such goods or technology during the period of such foreign availability, unless the President determines that the absence of export controls under this section would prove detrimental to the national security of the United States."

12. Such a description is erroneous, since "elements of an offense" describe the conduct de-

fendants must engage in to be criminally liable. What defendants actually argue is that the statute describes preconditions to the listing of items on the CCL. For convenience sake, however, we will characterize the problem in the text as the defendants have.

13. The indictment alleges that defendants' actions defeated "the lawful government functions of the Department of Commerce." Indictment, at 5:4–7. Thus, the indictment implicitly alleges that the Secretary's placement of the items on the CCL complied with the requirements of sections 2403 and 2404.

accordingly, defendants' motion to dismiss must be denied. As I explain below, however, this ruling does not address the question of whether defendants may raise as a defense the Secretary's alleged noncompliance with the mandatory provisions of the statute.

## III

## DISCOVERY MOTION

Defendants' discovery request seeks to obtain information relating to the action of the Secretary of Commerce in placing export restrictions on the items listed in the indictment.[14] The defendants claim that this material is necessary to "ascertain whether the government followed legislative mandate" in placing the items on the CCL.

Federal Rule of Criminal Procedure 16 permits discovery that is "relevant to the development of a possible defense." *United States v. Clegg*, 740 F.2d 16, 18 (9th Cir.1984). The Government maintains that because defendants cannot challenge the Secretary's decision to impose export controls, none of the information sought by the defendants is material to a possible

defense.[15] I turn, therefore, to the question of whether defendants in a criminal case are entitled to challenge the Secretary's decision to place specific items on the CCL.

In support of its position that the Secretary's initial decision to place items on the CCL is exempt from judicial review, the Government asserts that: (1) the Act forbids judicial review of the Secretary's decision; (2) defendants waived their right to object to any deficiencies by failing to exhaust their administrative remedies; and (3) these issues involve "political questions" not subject to judicial review. I will address each argument in turn.

### A. *The Act*

The Government, relying on 50 U.S.C. App. § 2412(a), argues that Congress has explicitly precluded judicial review of the Secretary's decision to require an export license.[16] Thus, the court is presented with an issue of legislative intent. I have recently had several occasions to explain at length my understanding of the process of statutory construction. Synopsizing the formidable body of law that has evolved, I have explained that "[i]n the absence of a

**14.** Specifically, defendants' discovery motion seeks all documents in the possession of the Department of Commerce and the Department of Defense relating to information obtained by those agencies regarding: (a) the foreign availability of each item listed in the indictment as having been exported by the defendants; (b) the existence of and basis for any determination made by the President that the absence of export controls on any of the items listed in the indictment would prove detrimental to national security despite the foreign availability of the items; (c) the basis for any determination that the items listed in the indictment as having been exported would make a significant contribution to the military potential of any other country which would prove detrimental to the national security of the United States; (d) the existence of any multilateral agreement, formal or informal, to which the United States is a party and, under the terms of which, the export of any item listed in the indictment requires the specific approval of the parties to the multilateral agreement; and (e) the United States actively seeking the agreement of other countries, which supply items comparable to the items listed in the indictment, to control the exports of those items, and the basis for the executive branch's judgment that validated export licenses for these

items are necessary pending the conclusion of such agreement.

**15.** The Government also argues that defendants have not made a sufficient preliminary showing to justify their request. The Government points out that defendants have not provided the court with any evidence to indicate that the Secretary has not complied with his duties under the Act. Since the information necessary to make such a showing, if it can be made at all, is in the possession of the Government, I find this argument unpersuasive. I note that although the Secretary must prepare annual reports for Congress concerning his administration of the Act, *see* 50 U.S.C. App. § 2413, which apparently are publicly available, these reports do not appear to contain specific findings regarding the particular items the defendants are accused of exporting without a license.

**16.** 50 U.S.C. App. § 2412(a) provides that, except with respect to the imposition of administrative sanctions, including civil penalties, "the functions exercised under this Act are excluded from the operation of sections 551, 553 through 559, and 701 through 706 of title 5, United States Code."

binding construction of the statute, the court in construing a statute undertakes a sequential analysis, beginning with an examination of the plain language of the statute; if that examination is non-dispositive, it is followed by an examination of the legislative history, and finally if an ambiguity remains, it is resolved by application of textual and extrinsic aids to construction." *Dodd v. John Hancock Company*, 688 F.Supp. 564, 568 (E.D.Cal.1988).[17] Since no binding authority has resolved the issue, I turn first to the words of the statute.

While it is clear that section 2412(a) precludes judicial review of the Secretary's decision under the Administrative Procedure Act ("APA"), the statute is silent as to the propriety of judicial review in the context of a criminal prosecution. An ambiguity exists where "[p]lainly the text of the statute fails to address the issue pertinent to decision of this case." *Busic v. United States*, 446 U.S. 398, 407, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980). Because ambiguity exists, I turn to the statute's legislative history.

The legislative history cited by the Government suggests that Congress' intent was to exempt policy determinations made pursuant to the Act from judicial review under the Administrative Procedure Act. In reenacting the provisions of the Act precluding judicial review in 1979, Congress observed that the legislation "continues the exemption of all functions exercised under the Act from the Administrative Procedure Act and from judicial review." S.Rep. No. 169, 96th Cong., 1st Sess. 17, *reprinted in* 1979 U.S.Code Cong. & Admin.News 1147, 1164. In like manner, Senator Proxmire's comment concerning the 1985 amendments to the judicial review provisions for enforcement proceedings, explains "Congress['] reasons for excluding other provisions of this act from the requirements of the Administrative Procedure Act including judicial review." 130 Cong.Rec. 3393 (1984). This history,

though clearly not dispositive, suggests that Congress desired more than a prohibition of judicial review under the APA, though whether that prohibition extends to criminal cases is simply not discussed. The Government has cited no legislative history indicating that Congress specifically intended to preclude judicial review in the context of a criminal prosecution, or that it even considered that matter. As the Supreme Court has explained, Congress' silence as to judicial review of administrative actions in a criminal context "is not necessarily to be construed as a denial of the power of the federal courts to grant relief in the exercise of the general jurisdiction which Congress has conferred upon them." *Estep v. United States*, 327 U.S. 114, 120, 66 S.Ct. 423, 426, 90 L.Ed. 567 (1946).

While conceding that there is no binding authority, the Government argues that all the courts that have interpreted the Act uniformly prohibit judicial review in a criminal context, relying on *Moller–Butcher*, 560 F.Supp. 550 (D.Mass.1983), *United States v. Gregg*, 829 F.2d 1430 (8th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988), and *Spawr v. Optical Research, Inc. v. Baldridge*, 649 F.Supp. 1366 (D.D.C.1986). The court does not find either the Government's argument or the cases it relies on particularly persuasive. I begin by noting that the issue addressed in each of these cases was whether the policy objectives contained in section 2402 were elements of an offense under the Act. Thus, it is clear that these cases are distinguishable from the matter at bar. In none of those cases was the court required to address the question of whether defendants could challenge the Secretary's determination in defense of their prosecution.

Nor are the cases as uniform as the Government suggests. At least one case, not cited by the Government, suggests a different result. In *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076 (9th Cir.1982), *cert. denied,* 461 U.S.

17. For a more detailed exposition of the process, *see Catholic Social Services, Inc. v. Meese,* 664 F.Supp. 1378, 1382–83 (E.D.Cal.1987).

905, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983) ("*Spawr I*"), the criminal counterpart to *Spawr II*, the Ninth Circuit considered the President's authority to maintain export regulations during a lapse in the Export Administration Act by declaring a national emergency. The court undertook the review to determine whether the actions taken "comport[ed] with the power delegated by Congress." *Spawr I*, 685 F.2d at 1081. While hardly dispositive, *Spawr I* suggests that judicial review for the limited purpose of determining whether the actions taken by the executive were in accordance with the power delegated by Congress is proper, even where the subject matter implicates "essentially-political questions." *See id.*

As I have indicated above, the cases relied upon by the Government are distinguishable from the matter at bar. Candor, however, requires that I recognize that broad dicta in those cases supports the Government's contention that defendants may not defend a charge of violation of section 2410(a) on the grounds that the items exported were listed on the CCL in violation of the statutory standards. I believe that such dicta may be disregarded, not simply because it is dicta, but as I explain below, because those cases fail to address a relatively well-developed line of authority which directly addresses the question of the rights of a defendant to attack an administrative decision which forms the predicate for criminal prosecution. That precedent has been developed by the Supreme Court in two fields of criminal law, selective service violations and the immigration law. Two Supreme Court cases frame the line of cases.

In *Estep v. United States*, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946), a defendant was indicted under Section 11 of the Selective Training and Service Act for willfully failing and refusing to submit to induction. The defendant sought to defend on the ground that he had been improperly classified as available for military service. The issue resolved by the Court was whether the defendant could obtain judicial review of his classification by the Selective Service System where the Act not only made no provision for such review, but rather characterized the decisions of the local board as "final."

The Court first held that the failure of Congress to provide for judicial review of classifications was not dispositive. *Estep*, 327 U.S. at 119–20, 66 S.Ct. at 426. To the contrary, it concluded that the statute could not be read "as requiring the courts to inflict punishment on registrants for violating whatever orders the local boards might issue … no matter how flagrantly they violated the rules and regulations which define their jurisdiction." *Estep*, 327 U.S. at 121, 66 S.Ct. at 427. The Court observed that such an interpretation would violate fundamental protections customarily accorded the accused. Accordingly, the provision of the Act making the decisions of the local boards "final" was held to mean that while judicial review was available in the criminal context, the trial court was not permitted to weigh the evidence to determine whether the classification made by the local draft board was justified; judicial inquiry, however, was permitted as to the question of whether the local board acted beyond its jurisdiction, i.e., whether there was any basis in fact for the board's classification of the registrant. *Estep*, 327 U.S. at 122–23, 66 S.Ct. at 427–28; *see also Cox v. United States*, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1947).

The Supreme Court has recently applied the rationale of *Estep* in the field of criminal prosecution for illegal immigration. In *United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), the issue was whether an alien prosecuted for illegal entry following deportation, in violation of 8 U.S.C. § 1326, may assert in the criminal proceeding the invalidity of the underlying deportation order. Once again, the Court held that although neither the text nor the background of section 1326 demonstrated any congressional intent to permit such a defense, the failure of Congress to expressly permit challenges to a deportation order in a section 1326 prosecution did not end the inquiry. The Court explained that "where a determination made in an administrative proceeding is to play a critical role in the subsequent impo-

sition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *Mendoza–Lopez,* 107 S.Ct. at 2154. The Court concluded, therefore, that due process required that a defendant be permitted to present such a defense.

Both *Estep* and *Mendoza–Lopez* address questions that are truly analogous to the matter at bar, and are thus very persuasive. Other reasons also argue against the Government's contention that no form of judicial review exists. As I have noted above, where after examination of the language of the statute and the legislative history ambiguity exists, resort must be had to textual and extrinsic aids to construction. Resort to both textual examination and canons of construction are instructive. First, Congress' prohibition of civil review in a single statute creating both civil and criminal consequences for violation of the licensing provisions of the Act may be seen as a textual aid, suggesting that review in the criminal context is permitted. *Cf. INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) ("[w]here Congress includes particular language in one section of a statute but it omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"). Two canons of statutory construction, however, militate much more directly against the Government's position.

In this case, the Secretary has made a decision to place the items allegedly exported by the defendants on the CCL. Since that decision provides the basis for imposing criminal sanctions against defendants, it may well be that due process requires that there be some "meaningful review" of the Secretary's decision. *See Mendoza–Lopez,* 107 S.Ct. at 2154. If the statute were construed to deny judicial review, a serious question of its constitutionality would arise. It is fundamental that statutes should be construed to avoid constitutional issues. *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering,* 467 U.S. 138, 157–58, 104 S.Ct. 2267, 2278–79, 81 L.Ed.2d 113 (1984), and cases cited therein. A second canon is also applicable. Indeed, it is a "familiar rule that, 'where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.'" *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 285, 98 S.Ct. 566, 572, 54 L.Ed.2d 538 (1978) (quoting *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971)); *see also Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed. 2d 434 (1985), and cases cited therein. Since neither the statute nor its legislative history addresses the question of whether judicial review of the Secretary's decision may be sought as a defense in a criminal prosecution, application of those canons of construction requires that some form of judicial review be permitted.

■ For the reasons set forth above, I have determined that defendants are entitled to some form of judicial review of the Secretary's determination that the items they are accused of exporting met the statutory criteria for inclusion on the CCL. That determination, however, does not address the issue of the scope of review. Consistent with *Estep* and *Mendoza–Lopez,* the court holds that the scope of review to which defendants are entitled is a limited one. That decision is supported by other considerations as well. First, the fact that Congress precluded APA review of the Secretary's actions and the legislative history cited above must be viewed as some evidence of a general congressional intent to accord significant deference to the type of policy determinations the Secretary of Commerce is called upon to make under the Act. Moreover, as I explain in section III–C, *infra,* the doctrine of political questions also suggests a more limited review function for the court. For these reasons, it is this court's view that judicial review does not extend to a weighing of the evidence to determine whether the imposition of export controls on the items in question was justified; rather, the court may consider only the question of whether the Secretary acted within his jurisdiction, that is,

whether there was any basis in fact for placement of the items on the CCL.[18]

B. *Failure to Exhaust Administrative Remedies*

■ The Government asserts that even if the court has the power to review the Secretary's decision to impose controls on the items in question, the court ought not to do so in this case because the defendants have waived any right to contest that decision. After the court asked the parties to address the selective services cases, the Government maintained that insofar as they have any bearing on this issue at all, the instant case is analogous to *Falbo v. United States*, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305 (1944). In *Falbo*, the defendant challenged the order of his local draft board before he had exhausted his administrative remedies. Under those circumstances, the court refused to permit judicial review of the propriety of the board's classification. *See also McGee v. United States*, 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971). The Government argues that since defendants failed to pursue the licensing process,[19] they did not exhaust their administrative remedies and are now precluded from challenging the Secretary's decision. That argument must fail. Defendants are not challenging the denial of a license, but the initial decision by the Secretary to require a license. As to that determination, there is no administrative appeal procedure.[20] The Act states that it is the intent of Congress that, to the extent practicable, the public shall be given an opportunity to comment on regulations imposing export controls before they take effect. 50 U.S.C. App. § 2412(b). While Congress has expressed its intent that there be a "meaningful opportunity for public comment," *id.*, it has not provided for administrative challenges to the Secretary's ultimate determinations.

■ It is true, as noted above, that the statute requires the Secretary to periodically review items subject to national security controls. Moreover, the statute requires the Secretary to "provide interested Government agencies and other affected or potentially affected parties with an opportunity, during such review, to submit written data, views, or arguments, with or without oral presentation" for the purpose of demonstrating to the Secretary that revision of the CCL is appropriate. 50 U.S.C. App. § 2404(c)(3). Again, these provisions merely permit exporters and other interested parties to make recommendations to the Secretary. *See* 15 C.F.R. § 370.1(b) (1982) and (1983). They do not provide for challenges to the Secretary's ultimate decisions concerning revision of the list. Before a defendant can be required to exhaust an administrative remedy, there must be a remedy provided. *See Allen v. Grand Central Aircraft Co.*, 347 U.S. 535, 540, 74 S.Ct. 745, 748, 98 L.Ed. 933 (1944). The statute's requirement of public input and comment simply does not constitute such a remedy.

■ The statutory and regulatory provisions concerning "foreign availability," however, tender a more complex question

**18.** Whether there was any basis in fact for the Secretary's determination is a matter to be determined by the court, not the jury. *See Cox*, 332 U.S. at 452–53, 68 S.Ct. at 119–20. While it is true that "[a] defendant charged with a serious crime has the right to have a jury determine his guilt or innocence," *Cabana v. Bullock*, 474 U.S. 376, 384, 106 S.Ct. 689, 696, 88 L.Ed.2d 704 (1986), the question of whether an item has been properly placed on the list does not address the defendant's conduct, but rather examines the lawfulness of the Secretary of Commerce's determination. *See Cox*, 332 U.S. at 453, 68 S.Ct. at 120.

**19.** Defendants initially submitted an application for a validated export license to the Department of Commerce. The Department returned their application without action. In an attached memorandum, the Department explained that defendants' application was inadequate and that no license would be issued until the application was resubmitted with a more detailed description of the equipment the defendants intended to export. *See* 50 U.S.C. App. § 2409(b)(3). Defendants never resubmitted their application but, according to the indictment, exported the equipment without a license.

**20.** In fact, the Government takes the position that the Secretary's initial decision to place an item on the CCL is exempt from *administrative* or judicial review. Government Brief, filed November 4, 1987, at 10.

of exhaustion. The Act provides that the Secretary must approve any application for a validated license which is required under that section:

> [I]f the Secretary determines that such goods or technology will, if the license is denied, be available in fact to such country from sources outside the United States ... in sufficient quantity and of sufficient quality so that denial of the license would be ineffective in achieving the purpose set forth in subsection (a) of this section, subject to the exception set forth in paragraph (1) of this subsection.

50 U.S.C. App. § 2404(f)(2). Where the Secretary makes a determination of foreign availability under the above provision, he must also consider whether a determination of foreign availability for purposes of removing the controls on such items under section 2404(f)(1), *see supra*, at n. 11, is warranted. *Id.* Any determination of foreign availability which is the basis of a decision to grant a license for, or remove a control on, the export of a good or technology, must be made in writing and must be supported by reliable evidence. 50 U.S.C. App. § 2404(f)(3). The statute specifically provides that in assessing foreign availability with respect to license applications, "uncorroborated representations by applicants shall not be deemed sufficient evidence of foreign availability." *Id.*

Pursuant to 50 U.S.C. App. §§ 2404(f)(2) and (3), the Secretary has implemented regulations which permit applicants to make a claim of foreign availability with respect to items controlled for national security purposes. 15 C.F.R. Part 391 (1985). These regulations were enacted in 1985. Prior to that time, there appear to have been no comparable regulations. In the absence of such regulations, the statutory requirements do not in themselves create an administrative remedy. Accordingly, the defendants were unable, and thus not required, to exhaust any administrative remedy. Moreover, even if these regulations

existed at the time the alleged offenses were committed, they would not constitute an administrative remedy which must be exhausted before defendants could challenge the Secretary's determination.

■ In order to make a claim of foreign availability under these regulations, the applicant must file a "Foreign Availability Submission" ("FAS"). 15 C.F.R. § 391.1(d) (1985).[21] The FAS must contain information regarding the names and addresses of sources outside the United States, product names and model designations of both the U.S. commodities and their foreign counterparts, technical data needed for comparison of the commodities, and information on production and demand. 15 C.F.R. § 391.2(d)(1) (1985). The submission should also be accompanied by supporting evidence, such as foreign manufacturers' catalogs or manuals, articles from trade publications, photographs, or depositions based on eyewitness accounts. 15 C.F.R. § 391.2(d)(2) (1985). Although the regulations provide that "[a]ny person, including a trade association or a Department of Commerce Technical Advisory Committee, may submit a decontrol FAS," 15 C.F.R. § 391.2(c)(2) (1985), it is unlikely that individual exporters will have access to or the ability to compile the information required to make a claim of foreign availability. Thus, for persons in defendants' position, this "remedy," as a practical matter, may be no remedy at all. Application of the doctrine of exhaustion of administrative remedies, where not mandated by Congress, does not implicate the jurisdiction of the court. *Marathon Oil Co. v. United States*, 807 F.2d 759, 768 (9th Cir.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). Rather, it serves to provide the court with a complete record, to give the agency an opportunity to apply its expertise, and to protect the agency's ability to perform its functions in an orderly way. *See, e.g., Montgomery v. Rumsfeld*, 572 F.2d 250, 254 (9th Cir.1978). These

---

21. A claim of foreign availability may be made in connection with an application for a validated license, where such license has been denied. 15 C.F.R. § 391.2(b) (1985). That provision is not relevant here since, as noted above, defend-
ants are not challenging the denial of a license. However, a claim of foreign availability may also be made outside the licensing process for the purpose of decontrol. 15 C.F.R. § 391.2(c) (1985).

factors must be balanced against the defendant's interest in defending himself. *Id.* at 253. Put another way, the Supreme Court has held that the exhaustion doctrine "is not to be applied inflexibly in all situations," *McGee,* 402 U.S. at 483, 91 S.Ct. at 1568, and that "use of the ... doctrine in criminal cases can be exceedingly harsh," *McKart v. United States,* 395 U.S.¹ 185, 197, 89 S.Ct. 1657, 1664, 23 L.Ed.2d 194 (1969). Given that it is unlikely that individual exporters would have the resources to launch a meaningful attack on the foreign availability of items listed on the CCL, I conclude that defendants would not have had to avail themselves of the procedure established in 15 C.F.R. § 391.2 (1985) in order to challenge the Secretary's foreign availability determination in defense of a criminal indictment.

## C. *Political Question*

█ The Government contends that the decision of the Secretary to place an item on the CCL is a nonjusticable political question. The political question doctrine is primarily a subset of the broader doctrine of separation of powers, implicating the relationship between the federal judiciary and the coordinate branches of the federal government. *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986).

The Supreme Court has identified six factors that are to be considered in determining whether a nonjusticable political question is presented:

(1) A textually demonstrable constitutional commitment of the issue to a coordinate political department;

(2) A lack of judicially discoverable and manageable standards for resolving it;

(3) The impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion;

(4) The impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

(5) An unusual need for unquestioning adherence to a political decision already made;

(6) The potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker,* 369 U.S. at 217, 82 S.Ct. at 710; *Armstrong v. United States,* 759 F.2d 1378, 1380 (9th Cir.1985). The presence of any one of the above factors renders a question unreviewable. *Armstrong,* 759 F.2d at 1380.

I need not decide if the political question doctrine governs the issue of whether the export of a given commodity is in fact detrimental to the foreign policy or national security interests of the United States.²² That question is not tendered in this case. Rather, given the Court's ruling above, the scope of the present inquiry extends only to whether there was any basis in fact for the Secretary's determinations. The considerations which give rise to a "political question" simply are not implicated by that limited inquiry.

## D. *Conclusion re Discovery*

█ For all of the reasons noted above, the court has determined that where defendants are charged with a violation of 50 U.S.C. App. § 2410(a), predicated upon exporting items on the CCL without a license, they may tender as a defense the issue of whether the Secretary had no basis in fact

---

**22.** Questions of national security as they relate to foreign policy are generally viewed as being within the "province and responsibility of the Executive," *Haig v. Agee,* 453 U.S. 280, 293–94, 101 S.Ct. 2766, 2774–75, 69 L.Ed.2d 640 (1981), and "[a]s to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974); *see also Department of the Navy v. Egan,* — U.S. —, 108 S.Ct. 818, 821, 98 L.Ed.2d 918 (1988).

518

in either initially placing and/or maintaining the exported items on the CCL. Accordingly, discovery must be allowed as to that issue. To determine whether the Secretary had or has a basis in fact, the administrative record pertaining to these decisions must be produced by the Government for review by the defendants and the court. The Government shall produce the record within thirty (30) days of the effective date of this order.

IT IS SO ORDERED.