UNITED STATES of America

v.

Brian A. MOLLER–BUTCHER, Paul C. Carlson, M.E.S. Equipment, Inc. and C–O Manufacturing Company, Inc.

Crim. A. No. 82–00066.

United States District Court, D. Massachusetts.

March 25, 1983.

Joan C. Stanley, Asst. U.S. Atty., Boston, Mass., for plaintiff.

Herbert Rubin, Peter J. Kurshan, Herzfeld & Rubin, P.C., New York City, for Moller-Butcher.

James Roosevelt, Herrick & Smith, Boston, Mass., for Carlson and C.O. Mfg. Co.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

Defendants Brian A. Moller-Butcher, Paul C. Carlson, and two corporations, M.E.S. Equipment, Inc. and C–O Manufacturing Company, Inc. are charged with criminal violations of the Export Administration Acts of 1969 and 1979 (50 U.S.C. App. §§ 2401–2420)[1] and 18 U.S.C. § 1001. Specifically, defendants are accused of exporting certain technological equipment between 1979 and 1981 to restricted countries without obtaining a validated license as required by the Acts and regulations thereunder. They are also charged with making false statements in connection with the exports. The case is before me on a motion to dismiss the indictment and a motion to suppress evidence seized in a search of corporate offices on April 7, 1981.

---

1. Only two counts are brought under the 1969 Act. Those counts involve conduct occurring in May and June 1979 when the 1969 Act was in effect. All other counts are based on the 1979 Act. Unless otherwise specified, all statutory citations in this opinion refer to the 1979 Act.

*Motion to Dismiss*

Defendants were originally indicted on February 18, 1982. In the face of their motion to dismiss that indictment, the grand jury returned a superseding indictment on April 2, 1982. Defendants' motion to dismiss the second indictment raises most of the same objections made to the first.[2] The motion addresses only those nineteen of the thirty counts which allege violations of the 1969 and 1979 Acts (the "Export Act counts"). Defendants do not contend that the eleven counts alleging false statements under 18 U.S.C. § 1001 should be dismissed.

The primary thrust of defendants' motion is that the Export Act counts fail to state an essential element of the offenses they allege. With the exception of Count I,[3] all of the counts concern the export of technological equipment which is listed on a document drawn up pursuant to the Export Act called a Commodities Control List ("CCL"), 15 C.F.R. § 399.1. The CCL specifies the goods subject to export controls and the group of countries to which exports of certain products are restricted. By the use of code numbers and letters following products on the list, an exporter can determine whether a particular shipment of goods requires a validated license or not. The Secretary of Commerce has the ultimate authority to decide which goods are included on the list and how they are classified.[4] 50 U.S.C.App. § 2403(b) and § 2404(a), (c). However, that authority must be exercised in a manner that carries out the policies of the Act. 50 U.S.C.App. § 2403(d). Pursu-

ant to those policies, export restrictions should be imposed only on goods and technology "which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States." 50 U.S.C.App. § 2402(2)(A). Defendants contend that the grand jury must allege and the government must prove not only that the particular goods that defendants are accused of exporting without a license are listed on the CCL, but also that they fall within that category of goods which make a significant contribution to another country. Because eighteen counts of the indictment do not state what defendants claim is an element of the crime critical to a finding of guilt, they should be dismissed. *See Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

▪ The wording of the statutory sections and regulations under which the charges are brought does not support defendants' argument. Nowhere is the "significant contribution" standard listed as an essential element of a crime under the Act. The eighteen counts can be divided into two categories. Nine are brought under that section of the statute which makes a *knowing* violation of any regulation under the Act punishable as a crime. 50 U.S.C.App. § 2410(a).[5] The remaining nine counts allege violations of § 2410(b)(1) which provides a more severe penalty than § 2410(a) for anyone who *willfully* exports anything

2. Defendants attacked the first indictment for failing to charge that they committed certain acts with the requisite knowledge. The superseding indictment closely tracks the statutory and regulatory language so as to include the element of *scienter.* As a result, defendants have dropped that challenge to the indictment.

3. Defendants' argument about the failure of the indictment to state all the elements of the crime does not apply to Count I, which charges defendant Moller-Butcher with making a false and misleading statement in connection with an export. Defendants separately attack that count. *See infra.*

4. The Export Act sets up an elaborate statutory framework for the Secretary's decisions. He must consult with the Secretary of Defense,

other government agencies and departments, and "technical advisory committees" which include industry representatives. The President may overrule or modify any decision made, although a written explanation to Congress of the change may be required.

5. Counts VIII, X, XIII, XVI, XX, XXVI, XXIX, and XXX are brought under 50 U.S.C.App. § 2410(a) of the 1979 Act. Count II is brought under 50 U.S.C.App. § 2405(a) of the 1969 Act, identical to § 2410(a), except as to criminal penalties. The 1979 Act increases the fine and prison sentence to a maximum of $50,000 and five years.

contrary to the Act or regulations with knowledge of the export's destination and use.[6] Under the regulations, all the goods named in the indictment require a validated license by virtue of their classification on the CCL. By alleging that defendants had the requisite knowledge and that they shipped the equipment without a license in violation of regulations, the indictment states all the elements of the crime set forth in the statute and regulations thereunder. At trial, it is only those allegations which the government must prove beyond a reasonable doubt to prove defendants guilty under the statute and regulations. That the goods make a significant contribution to the military potential of another country was decided by the Secretary of Commerce when he placed them on the CCL; it is not, according to the Export Act itself, an element of the offense.

■ Defendants argue, however, that the "significant contribution" standard should be read into the statute in order to avoid a serious question as to its constitutionality. Without that standard as an element of the crime, they say, the Secretary of Commerce would have unbridled discretion to restrict the export of any product whether or not it actually contributed to the military potential of another country to the detriment of our own. I do not agree. First, the courts are not free to reconstruct statutes in a way contrary to congressional intent. *Scales v. United States,* 367 U.S. 203, 211, 81 S.Ct. 1469, 1477, 6 L.Ed.2d 782 (1961). Although Congress expressed a policy in 50 U.S.C. App. § 2402 which guides the Secretary's discretion in classifying items, it also clearly expressed its desire that the executive branch, not the courts, have the final word on which items should be restricted. 50 U.S.C.App. § 2412(a) (exempting decisions under the Act from the judicial review provisions of the Administrative Procedure Act). If the "significant contribution"

standard were read into the statute, an issue which Congress explicitly placed with the executive branch would be injected into the courtroom to be resolved by a judge or jury.

■ Second, the statute does not suffer from the constitutional infirmity defendants attribute to it. Defendants' argument appears to be that, as here interpreted, the statute improperly delegates legislative power to the executive branch: if the Secretary has uncontrolled discretion to restrict the export of equipment, he is exercising lawmaking authority without a congressional or judicial check. *Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). However, in the field of foreign affairs, Congress may delegate much more power to the executive than it can in domestic matters. *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). The executive branch is privy to information, some of it confidential, to which the Congress does not have access, and decisions in the highly changeable and explosive field of foreign affairs are not easily or best made in a legislative forum. *Zemel,* 381 U.S. at 17, 85 S.Ct. at 1281. Citing those Supreme Court cases and principles, courts have upheld against a delegation challenge the predecessor of the Export Act which forbade the export without a license of goods on a Munitions List. *See, e.g., United States v. Stone,* 452 F.2d 42 (8th Cir.1971); *Samora v. United States,* 406 F.2d 1095 (5th Cir.1969). The power to classify goods on the CCL—and to restrict them for export on national security grounds—can (and should) be turned over to the executive branch, as it has the dominant role in conducting foreign policy.

---

6. Counts III, VI, XII, XIV, XVIII, XXI, XXIII, XXIV, and XXVIII are brought under 50 U.S.C. App. § 2410(b)(1). That section sets a ten year prison term and a maximum $250,000 fine for anyone who "willfully exports anything contrary to any provision of this Act ... or any regulation, order or license issued thereunder, with knowledge that such exports will be used for the benefit of any country to which exports are restricted for national security or foreign policy purposes."

Defendants' interpretation of the statute as requiring proof of the significant contribution of each exported item fails for three additional reasons. First, the enforcement in a court of any limits Congress did choose to place on the executive's discretion in this area would be virtually impossible. Whether particular items make a significant contribution to a country's military potential and hurt our own national security is the quintessential political question. It entails a policy judgment best left to the executive branch, and is incapable of resolution by any judicially discoverable or manageable standard. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (listing the identifying features of the political question doctrine). The issue is simply beyond the ken of a judge, even more a jury. Second, defendants have suggested no authority that the export of technological equipment is a matter of right. It is rather a privilege subject to government controls. Moreover, defendants did nothing to challenge or even question the restriction before they allegedly exported the sensitive merchandise although, according to the indictment, they had full knowledge of the illegality of their actions.[7] It is hard to discern the unfairness of the predicament in which they now find themselves. Finally, that the Secretary could, in some hypothetical case, "abuse" his discretion by restricting obviously innocuous goods does not mean that the guidelines for exercising his discretion must be essential elements of the crime. To use defendants' example, the Secretary has not restricted the export of rubber bands and paper clips. Defendants are instead charged with shipping integrated circuit testers, microprocessor labs, and oscilloscopes.

Defendant Moller-Butcher separately challenges Count I, which charges him with "knowingly and willfully" making "a false and misleading representation" in a sworn affidavit submitted to the United States Customs Service in connection with the export of certain commodities. Specifically, Moller-Butcher "indicated and implied" that those products were for repair or resale by parts in England, when he knew that they were in fact to be sold to Romania under a purchase-and-sale agreement. This conduct is alleged to violate 50 U.S.C.App. § 2405(a) of the 1969 Act and the related regulation of 15 C.F.R. § 387.5(a)(3). Defendant does not attack the sufficiency of the indictment itself but rather challenges the regulation prohibiting the alleged conduct. He contends that 15 C.F.R. § 387.5 is unconstitutionally vague in that it prohibits *misleading* representations in addition to false ones.

■ The void-for-vagueness doctrine is based on the individual's due process right to have fair warning of what constitutes a crime before he is prosecuted. "[C]riminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *United States v. National Dairy Products Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963). However, courts have been reluctant to hold legislatures (and agencies) to too strict a standard of specificity. "[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations

---

**7.** Although exempting the export decision itself from judicial review, the Export Act affords a number of safeguards designed to protect the interests of those affected by export controls. The statute sets out in detail the procedure for processing export license applications. 50 U.S.C.App. § 2409. If necessary, the application is subject to review by several agencies. Questions concerning the application must be forwarded to the applicant, who shall have an opportunity to respond in writing before a final determination is made. 50 U.S.C.App. § 2409(f)(2). If the application is turned down, the Secretary must state the reasons why, and the applicant is given the chance to make modifications in the product in consultation with Commerce Department personnel. 50 U.S.C. App. § 2404(a)(2)(B). Any person who has in the past exported a good which is now subject to restrictions may petition for an exemption based on hardship. 50 U.S.C.App. § 2408. Apart from the licensing process itself, the statute gives the public an opportunity to comment on regulations imposing export controls before they take effect. 50 U.S.C.App. § 2412. The public shall also be given the chance to present evidence to technical advisory committees which provide input to the Secretary in the formulation of regulations. 50 U.S.C.App. § 2404(h).

in factual situations, and the practical necessities of government inevitably limit the specificity with which the legislatures can spell out prohibitions." *Boyce Motor Lines v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952). Moreover, laws which are too narrow invite easy evasion. Unless First Amendment rights are at stake, a law attacked for vagueness should be appraised in light of the facts and circumstances of the particular case. *Robinson v. Berman,* 594 F.2d 1, 2 (1st Cir.1979).

Other sections of the United States Code impose criminal penalties for "misleading" statements. *See, e.g.,* 7 U.S.C. § 13; 15 U.S.C. § 78ff; 22 U.S.C. § 1980; 30 U.S.C. § 941; 33 U.S.C. § 931. And, courts have upheld criminal statutes and regulations with language no less imprecise than the one at issue here. *See, e.g., Robinson v. Berman,* 594 F.2d 1 (upholding statute prohibiting "unnatural or lascivious" acts); *Boyce Motor Lines,* 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (upholding regulations requiring carriers to "avoid so far as practicable" traffic routes which are "congested"); *United States v. Pope,* 189 F.Supp. 12 (S.D.N.Y.1960) (holding that an indictment charging a misstatement of "material fact" was not unconstitutionally vague). Finally, the indictment alleges that the defendant "knowingly and willfully" made the false or misleading representation. The additional element of knowledge or intent in connection with the proscribed act considerably weakens the objection that the regulation is being used to punish without warning an offense of which the accused was unaware. *Screws v. United States,* 325 U.S. 91, 102, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945).

■ Defendants' final challenge to the indictment concerns all nineteen Export Act counts, including Count I: they argue that all counts should be dismissed because they fail to apprise defendants of the charges against them so that they can mount an adequate defense. *See United States v. Mouton,* 657 F.2d 736, 739 (5th Cir.1981). In particular, all of the counts use the word "export" without defining the term or specifying from what point and how the exports were made. Defendants acknowledge that the word has a commonly understood meaning. They instead seek details concerning manner and means. The counts give dates, generally locate the offense in Massachusetts, name and describe the goods exported in some detail, and specify their destination. When viewed as a whole, the indictment conveys sufficient information to enable defendants to prepare their case. *Compare United States v. Tomasetta,* 429 F.2d 978 (1st Cir.1970) (indictment charging loan sharking held defective because it did not specify the extortionate means defendant used to collect loans, *and* it did not name the victim or locate the offense).

### Motion to Suppress

Defendants move to suppress certain business records of M.E.S. Equipment and C-O Manufacturing seized in a search of corporate offices in Brockton on April 7, 1981. As grounds for their motion, they attack the sufficiency of the seven-page affidavit issued in support of the warrant and argue that the warrant's description of the items to be seized is overly broad. The affidavit, submitted by a special agent of the United States Customs Service, details the results of a two-year investigation and lists at least three specific instances of the export of items without a validated license as required by law. Defendants claim that the affidavit contains one material misrepresentation of fact and has so much unsubstantiated hearsay that it cannot possibly support the magistrate's finding of probable cause.

■ The sufficiency of the affidavit is to be judged in accordance with several well established principles. First, the evidence in support of a search need only persuade a person of reasonable caution. *Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). It need not be legally competent and may in fact be hearsay, so long as certain conditions are met. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Second, the affidavit must be read in a commonsense and realistic man-

ner, with an ungrudging and positive attitude. *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965). Because of the Supreme Court's expressed preference for warrants and the need to encourage their use, less evidence may be required to sustain a search with a warrant than a search without one. *Id.* at 106, 85 S.Ct. at 744. Finally, due deference should be accorded the magistrate's finding of probable cause. It should be upheld if there is a "substantial basis" for his conclusion. *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960).[8]

The affidavit in the instant case is replete with hearsay. Much of the affiant's information appears to come from other customs officials as well as certain persons associated with companies with which defendants allegedly had direct or indirect contact. Defendants claim that the hearsay cannot be used to support a finding of probable cause because it does not meet the two-pronged test set out in *Aguilar,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723. In that case, the Supreme Court held that although an affidavit may contain hearsay by unnamed informants, it must also set out some of the underlying circumstances which would show (1) the basis for the informant's conclusions, and (2) the informant's credibility and the reliability of his information.

 It is highly questionable, however, that the second-prong of *Aguilar* concerning the veracity of the informant is even applicable here. Government officials are presumed reliable. *United States v. Flynn,* 664 F.2d 1296, 1303 (5th Cir.), *cert. denied,* 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982); *See also United States v. Ventresca,* 380 U.S. at 111, 85 S.Ct. at 747. Thus, the affidavit need not attest to or demonstrate the credibility of the customs officials whose hearsay statements are reported. It is also generally recognized

that the informant who witnesses a crime or gives information to police out of a sense of civic duty need not meet *Aguilar's* "veracity" test. *United States v. Melvin,* 596 F.2d 492, 497 (1st Cir.), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979); *United States v. Burke,* 517 F.2d 377, 380 (2d Cir.1975). *Aguilar* and its progeny were specifically addressed to the paid professional informant who operates on the fringes of criminal activity, often has a motive to falsify, and hides behind a cloak of anonymity. The persons giving information in this affidavit hold responsible positions in various companies and have no discernible interest in the case. Moreover, they are named. Although not determinative,[9] the fact that the informant is identified is a factor in concluding that he is an average citizen with no reason to lie and is therefore entitled to a presumption of reliability absent special circumstances suggesting the contrary. *See United States v. Rollins,* 522 F.2d 160, 164 (2d Cir.1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *Cundiff v. United States,* 501 F.2d 188, 190 (8th Cir.1974). I conclude that the named informants in this case are worthy of belief.

Although the reliability requirement of *Aguilar* may be relaxed because of the identity of the informants here, the requirement that the affidavit set forth facts showing a basis for their conclusions must still be met. In this regard the affidavit is not particularly well drawn. It does not explicitly state how or where the informants got the information they report. In relating the results of the customs agents' work on the case, the affidavit often says only that the investigation "revealed" certain facts without saying how those facts were discovered. However, the affidavit is highly detailed, giving dates, names, and even identifying numbers of certain docu-

---

8. The Fourth Amendment standing rule announced in *Jones* was overruled in *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). The proposition as to the weight accorded the magistrate's finding of probable cause remains good law, however. *See also United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

9. The Assistant United States Attorney argues that *Aguilar* does not apply to this case simply because the informants were named. The naming in and of itself, however, does not conclusively establish that the informant is trustworthy. *United States v. Flynn,* 664 F.2d 1296 (5th Cir.1982).

ments and invoices. The data it contains is not of the type that "could just have easily been obtained from an offhand remark at a neighborhood bar." *Spinelli v. United States,* 393 U.S. 410, 417, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969). The very nature of the information implies some degree of firsthand knowledge by those disclosing it. Moreover, when read in a commonsense and ungrudging fashion, many references in the affidavit implicitly show that information the government officials relay was in fact based on their personal observations.[10] To ignore those references because of careless drafting would be to adopt exactly that hypertechnical approach condemned by the Supreme Court. Finally, those bits of information which may not be adequately supported by a description of how they were obtained may still be considered in conjunction with other evidence to determine probable cause. *Id.* at 418, 89 S.Ct. at 590; *United States v. Burns,* 624 F.2d 95, 100 (10th Cir.), *cert. denied sub. nom. Reynolds v. United States,* 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980). Looking at the sum total of the information and reading the affidavit in a practical and realistic manner, I conclude that it provides a substantial basis for the magistrate's finding.

Defendants further contend that the affidavit is deficient because it erroneously states that certain equipment shipped December 16, 1980 required a validated license under the Export Act. According to affidavits submitted by defendants, the equipment, which consists of ovens, developers, and photographic spinners, are all parts of a unit which did not require a validated license at that time. Defendants claim that because of that misrepresentation, they are entitled to a hearing as to how and why it was included. They also say that without the December 1980 export, there is not enough in the affidavit to support a finding of probable cause since the only other illegal act alleged occurred in 1979—too long before the 1980 warrant to be of any relevance.

None of these arguments have merit. As defendants themselves acknowledge, a hearing is required only if they make a substantial preliminary showing, with an offer of proof and affidavits, that the false statement in the search affidavit was made intentionally or with reckless disregard for the truth. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). No such showing has been made here.[11] Nor is the December 1980 export essential to the magistrate's finding of probable cause. The affidavit alleges a third and later instance of an illegal export: on April 2, 1981, customs agents seized a shipment from defendants M.E.S. Equipment and Paul Carlson containing a Hewlett Packard Spectrum Analyzer, which was to be sent under a general license rather than the validated license required by the Export Act. Defendants do not allege or prove that the Spectrum Analyzer required only a general license. This illegal export, occurring a week before the warrant was issued, is hardly stale information and could, in combination with the other details in the affidavit, support a probable cause determination.

Defendants' final attack concerning the overbreadth of the search warrant is equally unconvincing. The warrant sought "records which are required under the Export Administration Act, 15 C.F.R. § 387.13, by all businesses sending electronic equipment outside the United States." The regulatory citation in itself may not be an adequate limit on the scope of the search, since 15 C.F.R. § 387.13 covers transactions

---

10. For example, on page three of the affidavit, the affiant says that customs agents detained nine cases of equipment at Logan Airport on April 19, 1979 and seized more equipment on May 1, 1979. The affidavit then relates that examination of the merchandise revealed certain things. It can be properly implied that the facts so reported are a result of the government officers' firsthand observations of the equipment they seized.

11. In fact, the wording of the affidavit indicates quite the contrary. It states that the equipment seized on December 1980 was identical to that seized May 1979. Because the equipment required a validated license in 1979, the affidavit concludes that it therefore "appears" to require a validated license in 1980. Although the assumption may be wrong, it does not seem like a clearly reckless one to make.

other than those relating to the investigation of illegal activity for which there was probable cause.[12] *See In re Application of Lafayette Academy, Inc.,* 610 F.2d 1 (1st Cir.1979); *United States v. Roche,* 614 F.2d 6 (1st Cir.1980). However, the warrant goes on to list eleven types of records within that broader category set out by the regulation. The records clearly relate to the activities for which defendants were under investigation. Moreover, the description was sufficiently detailed to allow the customs agents conducting the search to identify the objects to be seized with reasonable certainty. This is not the kind of general warrant forbidden by the Fourth Amendment that gives law enforcement officers unfettered discretion to rummage through one's belongings. *See Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

For the reasons stated above, the motions to dismiss the indictment and to suppress the evidence seized in the April 1981 search are denied.

---

12. The regulation covers transactions involving restrictive trade practice, boycott requirements or requests, commodities exports, and "any other transaction subject to these regulations." It also applies to any negotiations connected with those transactions as well as certain exports to Canada.