UNITED STATES of America, Plaintiff,

v.

Abdelkader HELMY and James Huffman, Defendants.

No. CR.S–88–201 RAR.

United States District Court,
E.D. California.

May 31, 1989.

**1424**

Thomas E. Flynn, Asst. U.S. Atty., Sacramento, Cal., for plaintiff.

Marcus S. Topel, Daniel Cook, San Francisco, Cal., Clyde Blackmon, Dale Drozd, Sacramento, Cal., for defendants.

## ORDER

RAMIREZ, District Judge.

Defendants ABDELKADER HELMY and JAMES HUFFMAN are charged, *inter alia*, with exporting controlled commodities in violation of the Arms Export Control Act ("AECA"), 22 U.S.C. §§ 2751–2794, and with conspiracy to export certain commodities in violation of the AECA and the Export Administration Act of 1979 ("EAA"), 50 U.S.C. app. §§ 2401–2420. By motion filed January 6, 1989, defendants seek reconsideration of the magistrate's order of December 12, 1988, which denied defendants' request to discover documents relating to the placement of the commodities at issue on the United States Munitions List of the AECA and the Commodity Control List of the EAA.[1]

On February 13, 1989, the court entertained oral argument on the various issues raised by the moving and opposing papers. Marcus S. Topel, Esq. and Daniel Cook, Esq. appeared as counsel for defendant HELMY; Clyde Blackmon, Esq. and Dale Drozd, Esq. appeared as counsel for defendant HUFFMAN; Thomas E. Flynn, Assistant U.S. Attorney, appeared as counsel for the government. Having now reviewed the various pleadings filed by the parties, and being mindful of the oral arguments presented by respective counsel, the court issues the following memoranda opinion which, together with its previous order of February 24, 1989, is intended to resolve all issues raised by defendants in their request for reconsideration.[2]

## BACKGROUND

The prosecution alleges that between December 15, 1987, and June 24, 1988, defendants HELMY and HUFFMAN conspired to violate the AECA and the EAA by attempting to ship various listed commodities from the United States to Egypt without first obtaining an export license. The government alleges that the subject commodities included an ablative carbon composite material, a chemical known as hydroxylterminated polybutadiene, microwave antennas, a carbon-carbon material, a rayon based carbon fabric, and missile nose cones—all of which are allegedly important

1. The AECA regulates the export of materials whose primary purpose is military. 22 U.S.C. § 2778(a)(1). The EAA, promulgated in 1979 and intended to supplement the AECA, regulates the use of "dual use" articles, allowing the Secretary to regulate listed commodities for the purpose of national security and foreign policy *or* because of domestic short supply. 50 U.S.C. app. § 2402(2), (10). Under the AECA, the President, who has delegated his authority to the Secretary of State, *see* Exec. Order No. 11958, 42 Fed.Reg. 4311 (January 18, 1977), *reprinted in* 22 U.S.C. § 2751 Note, (Supp.1988), maintains a Munitions List; under EAA, the Secretary of Commerce, with the assistance of the Secretary of Defense, maintains a Commodity Control List.

Under penalty of criminal sanction, once an item is listed under either the AECA or the EAA, it may not be exported without first obtaining an export license from the Secretary.

Section 38(c) of the AECA provides that "[a]ny person who willfully violates any provision of this section or section 2779 of this title, or any rule or regulation issued under either section ... shall upon conviction be fined not more than $100,000 or imprisoned not more than two years, or both."

Section 11(a) of the EAA provides that "whoever knowingly violates any provision of this Act ... or any regulation, order, or license issued thereunder shall be fined not more than five times the value of the exports involved or $50,000, whichever is greater, or imprisoned not more than 5 years, or both."

2. By order of the court dated February 24, 1989, the court denied defendants' requested reconsideration of the magistrate's denial of their motion to take depositions in a foreign country, their motion for a commission to take said depositions, and for expenses to be paid by the government in regard thereto.

components of certain tactical and strategic missile systems, including this country's Pershing, Polaris, Trident, Minuteman, and Poseidon missiles, and the Space Shuttle. In addition to the conspiracy charges, the prosecution alleges that certain materials were actually purchased by HELMY, loaded on to an Egyptian C–130 transport, and flown to Egypt in various shipments occurring between March and June of 1988.

On June 23, 1988, a criminal complaint was filed in this court which named, among others, defendant HELMY and HUFFMAN. On June 29, 1988, HELMY and HUFFMAN were indicted by the grand jury of this district. On October 24, 1988, defendant HELMY filed the underlying discovery motion with the magistrate, seeking, in pertinent part, all documents concerning:

1. The placement of the "defense articles" ("approximately 430 pounds of ablative carbon composite materials manufactured by the Fiberite Corporation") listed in Count Two of the indictment on the United States Munitions List (the "Munitions List") pursuant to 22 U.S.C. § 2778 and 22 C.F.R. § 127.1, and the maintenance of those "defense articles" on the Munitions List.

2. The placement of the "defense articles" listed in Count One of the indictment on the Munitions List, pursuant to 22 U.S.C. § 2778 and 22 C.F.R. § 127.1, and the maintenance of those "defense articles" on the Munitions List.

3. As to Requests 1 and 2 *supra;*

(a) The existence of and the basis for any determination made by the President or his delegated designee to control the "defense articles" contained in Counts One and Two of the indictment and place them on the Munitions List;

(b) The opinions of the Director of the United States Arms Control and Disarmament Agency, if any, at to whether the export of the "defense articles" contained in Counts One and Two of the indictment will contribute to an arms race, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multinational arms control agreements, and how the export decisions process was coordinated with the Director of the United States Arms Control and Disarmament Agency;

(c) The existence of and the basis for any determination to maintain the "defense articles" contained in Counts One and Two on the Munitions List.

4. The placement of the "commodities" listed in Count One of the indictment on the Commodity Control List (the "CCL"), pursuant to the Export Administration Act of 1979 [50 U.S.C.App. § 2401 *et seq.*] and C.F.R. §§ 372.1, 375.3, and 387.- 6, and the maintenance of those "commodities" on the CCL;

(a) The foreign availability of all "commodities" alleged in the indictment as having been exported or as to which there was a conspiracy to export by the defendants;

(b) The existence of and basis for any determination made by the President or the Secretary of Commerce that adequate evidence was presented demonstrating that the absence of export controls on any of the "commodities" contained in the indictment would prove detrimental to the national security of the United States despite the foreign availability of the "commodities";

(c) The basis for any determination that all the "commodities" contained in the indictment would make a significant constitution (sic) to the military potential of any other country which would pose detrimental to the national security of the United States;

(d) The existence of any multilateral agreement, formal or informal, public or secret, to which the United States is a party and under the terms of which the export of any "commodities" contained in the indictment requires the specific approval of the parties to the multilateral agreement;

(e) The United States actively seeking the agreement of other countries, which supply "commodities" comparable to the "commodities" contained in the indictment, to control the exports of such "commodities" and the basis for the United States' decision that validated ex-

port licenses or other export licenses are necessary for these commodities pending the concluding of such an agreement.

The magistrate issued her order denying defendants' motions on December 12, 1988.[3] With respect to defendants' motion to discover certain documents relating to the placement of the commodities at issue on both the AECA's Munitions List and the EAA's Commodity Control List, the magistrate premised her denial on alternative findings; first, the magistrate held that defendants failed to show that the requested documents would be material; alternatively, the magistrate held that the Secretary's decision to place particular defense articles on the aforementioned lists was an unreviewable political question.

## DISCUSSION

### I

Two separate rulings are before the court: the magistrate's denial of the defendants' discovery request for lack of materiality and the magistrate's alternative denial under the political questions doctrine. The court's review of the magistrate's findings is conducted pursuant to the standard of review as set forth in E.D.Cal.R. 304(f), which provides for the granting of motions upon reconsideration when the magistrate's ruling is "clearly erroneous or contrary to law." Inasmuch as the issue of materiality

is ultimately subordinate to the magistrate's findings under the political question doctrine, the court addresses the latter finding exclusively and hereby affirms the magistrate's denial under the political question doctrine.[4]

### II

The defendants' discovery motion involves two separate levels of inquiry: the first is a request to review whether certain commodities and defense articles are indeed on the Commodity Control List and/or the Munitions List; the second is a request to review, if the commodities are in fact listed, whether they are properly listed.

On the issue of whether the subject commodities are indeed listed, the Ninth Circuit has recently held that the Secretary's determination as to what is actually on the list is conclusive. In *United States v. Spawr Optical Research, Inc.*, 864 F.2d 1467 (9th Cir.1988), the defendants were convicted of conspiring to export and exporting laser mirrors without a license in violation of the Export Administration Act of 1979, § 2 *et seq.*, 50 U.S.C. app. § 2401 *et seq.* Defendants specifically appealed the district court's decision to accept without review the Secretary's determination that the mirrors were on the list. The Ninth Circuit upheld the district court's deference to the Secretary, stating that,

---

**3.** The underlying motions were originally filed with Magistrate Mix on October 24, 1988. Defendant HUFFMAN filed a motion for a bill of particulars and a general discovery motion. Defendant HELMY filed a motion to take the depositions of several persons in Egypt as well as a separate motion for discovery. Each of the defendants has filed a *joinder* in the motions made by the other. A hearing was held on all four discovery motions on December 1, 1988. All but one of the requests in Huffman's Motion for a Bill of Particulars was granted. Three of the requests in Huffman's general discovery motion were granted; ruling on one other request was denied with prejudice. The remaining requests were limited to those materials whose disclosure is required by the Federal Rules of Criminal Procedure or the Supreme Court's rulings in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**4.** Ultimately, a document is not material if it will not and cannot be reviewed by the court or placed in controversy at trial. Since the court has concluded that defendants are seeking the discovery of nonjusticiable documents, the present issue of materiality is mooted, if not answered. Nonetheless, as a general rule of evidence, the court is not inclined to hinge the granting of such requests on the defendants' ability to first show materality in instances where such a possibility is thwarted by the very nature of the matter sought. *See, e.g., Roviaro v. United States,* 353 U.S. 53, 63–64, 77 S.Ct. 623, 629, 1 L.Ed.2d 639 (1957) (requiring the disclosure of an informer's identity where the informer's testimony *"might* have been helpful to the defense.") Finally, while the court is fully cognizant of the possibility that such requests run the risk of having been made for the purpose of harassment or delay, the mere existence of such a possibility cannot act to preclude discovery in situations where it is otherwise impossible to show materiality.

"[b]ecause the licensing issue was not an element of the charged offenses, the Spawrs are not denied due process or the right to a jury trial by deference to the Secretary's determination" that the Spawrs' mirrors were included on the CCL. *Id.* at 1473.

Present defendants contend that the decision in *Spawr Optical* is confined to whether a party can challenge the Secretary's conclusion that the commodities were *on* the list as opposed to the question of whether a court is free to review whether the items were *properly* placed on the list. Moreover, defendants submit determined arguments that *Spawr Optical*'s language and holding flatly contradicts a line of Supreme Court cases which hold that when an administrative proceeding plays a crucial role in the prosecution of a criminal defendant, the defendant is entitled to some form of judicial review. *See United States v. Mendoza–Lopez,* 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987); *Estep v. United States,* 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946).

With respect to a judicial review of the administrative proceedings, several cases are presented as being on point. Defendants cite *United States v. Mandel,* 696 F.Supp. 505 (E.D.Cal.1988), for the proposition that, despite *Spawr Optical,* the court is constitutionally required to review listing decisions under the EAA to determine whether they were based in fact.[5] The government, on the other hand, cites *United States v. Moller–Butcher,* 560 F.Supp. 550 (D.Mass.1983), and *United States v. Gregg,* 829 F.2d 1430 (8th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988), for the contrary holding. The cases cited by the government explicitly reject the defendants' arguments as they pertain to the EAA. Specifically, in *Moller–Butcher,* Judge Zobel denied the review of the listing determinations, stating "[w]hether particular items make a significant contribution to a country's military potential and hurt our own national security is the quintessential political question. It entails a policy judgment best left to the executive branch, and is incapable of resolution by any judicially discoverable or manageable standard." *Id.* at 554.

In each of the cases cited by the government, the court has failed to address or distinguish the line of Supreme Court cases so staunchly relied upon by the defendants. In fact, Judge Karlton's decision in *Mandel* is the only decision intrepid enough to confront the Supreme Court's decisions in *Estep* and *Mendoza–Lopez,* and, as such, resolutely concludes that the Due Process Clause of the Constitution compels the court to grant defendants' discovery motions.

In light of the complexities involved in distinguishing the holdings in *Estep* and *Mendoza–Lopez* from the present motion, the court surmises that the failure of the magistrate's ruling and the government's cases to broach the issues raised in *Estep, Mendoza–Lopez,* and *Mandel* is more the result of foresight than oversight. At the risk of being accused of lacking the former, the court will proceed to "throw its hat into the arena" and join brother Karlton in attempting to clarify that which others tend to avoid.[6]

5. In *Mandel,* Chief Judge Karlton of this district was faced with an issue nearly identical to the one presently before this court. Therein, defendants were charged with exporting high technology electronic equipment in violation of the EAA, 50 U.S.C. app. § 2410(a). Defendants sought documents possessed by the Department of Commerce and the Department of Defense concerning whether the particular items that the defendants were accused of exporting without a license were properly placed on the Commodities Control List (CCL).

6. In light of several references made in the briefing papers, it is important to explicitly define at the outset the scope of the court's inquiry and its ultimate ruling as one governed by the purpose of the individual acts at issue and the attendant ramifications of the political questions doctrine. The political questions doctrine, subsumed as it is by the separation of powers doctrine, "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986). Accordingly, the court's ruling is not and, for that matter, cannot be premised on

**1428**

## 1. Political Question

■ The Supreme Court has previously and steadfastly held that certain questions are of such an inherently political nature that the judiciary is incompetent to address them. *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). In this regard, the Court has listed six factors to consider, with the existence of one or more working to qualify the issue as nonjusticiable under the separation of powers doctrine. Those factors include (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Id.* at 217, 82 S.Ct. at 710; *Armstrong v. United States*, 759 F.2d 1378, 1380 (9th Cir.1985).

Under the AECA, in order to further the cause of "world peace and the security and foreign policy of the United States", the President of the United States "is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List." 22 U.S.C. § 2778(a)(1). Similarly, under the EAA, the Secretary of Commerce imposes controls on a commodity to the extent necessary to "restrict the export of goods and technology which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States." 50 U.S.C. app. § 2402(1).[7]

Although the existence of any one of the factors specified in *Baker* causes a question to be nonjusticiable, *Armstrong*, 759 F.2d at 1380, the court is of the view that all of the enumerated *Baker* factors would, in some way, be affected by the judicial review of a listing decision made under either the AECA or the EAA. The very nature of such decisions makes them political and, thus, nonjusticiable. With respect to the EAA, Congress made clear its intent as to whether the courts should have jurisdiction to overturn an executive listing determination by expressly exempting the Commodity Control List from the judicial review provisions of the Administrative Procedure Act. *See* 50 U.S.C. app. § 2412(a). Moreover, although the AECA fails to expressly preclude such review, the court does not conclude that, therefore, a review of the decisions that make up the

what has been called the "state secrets privilege."

"The state secret privilege is a common law evidentiary rule that protects information from discovery when disclosure would be inimical to the national security." *In Re United States of America*, 872 F.2d 472 (D.C.Cir.1989) (Lexis, Genfed library, USAPP file) The Supreme Court gave the doctrine its first modern expression in *United States v. Reynolds*, 345 U.S. 1, 7–8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953) wherein the Court clearly stated that the its invocation was dependent on the government's "formal claim of privilege, lodged by the head of the department which has control over the matter." *See also, Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C.Cir. 1983); *Halkin v. Helms*, 690 F.2d 977, 991 (D.C. Cir.1982). Inasmuch as neither the Secretary of State nor the Secretary of Commerce have made any attempt to invoke the privilege, the court

proceeds under the necessary assumption that the privilege is not in operation.

7. Although the EAA serves the dual purpose of controlling exports for reasons of domestic short supply as well as national security, 50 U.S.C. app. §§ 2404(a), 2405(a), 2406(a) and 2410, the commodities before the court are clearly of the later variety and are so designated on the Commodity Control List by the placement of an "A" after the usual four digit identification number. Such items are controlled for national security reasons by the United States in cooperation with the member countries of the Coordinating Committee for Multilateral Export Controls. *See* declaration of Michael E. Zacharia, Assistant Secretary for Export Administration in the Bureau of Export Administration of the U.S. Department of Commerce, 3.

Munitions List is warranted. Since the AECA deals exclusively with defense articles, and the listing decisions are exclusively political in nature, the political question doctrine supplants the congressional failure to address the issue.[8]

With respect to executive foreign policy decisions, the Court has stated:

> The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are neither nor ought to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948).

Defendants, nonetheless, rely on *United States v. Mandel*, 696 F.Supp. at 517, for the proposition that the political question doctrine can be avoided altogether by limiting the scope of review to whether the listing decisions under the AECA and the EAA were based in fact.[9] With this proposition, the court respectfully disagrees.

To begin, the court is of the view that it is singularly ill-equipped to delve into pure foreign policy determinations on even the most cursory level. Again, any listings are the very product of a national security analysis. Couching a judicial review of the determinations made under either the AECA or the EAA as one merely concerned with whether the Secretary's decision was based in fact does nothing to alleviate the folly of such an endeavor. Political determinations that flow directly from foreign policy and national security assessments, are, the court would suspect, more frequently derived from the shadows and subtleties of international tensions and alliances than from any identifiable logic or immediately discernible reality. As such, "[t]hey are delicate, complex, and involve large elements of prophecy." *Waterman Steamship Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436. Thus, with respect to such determinations, the court is firmly unwilling to arbitrarily demarcate were fact begins and were it ends. Such a task is, in and of itself, a function of policy. As the Supreme Court stated, such decisions

> ... are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

---

8. Although it has long been held that, absent evidence of a clear and convincing intent by Congress to the contrary, a strong presumption exists in favor of judicial review, *see e.g., Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), the Supreme Court has recently held that this "general proposition of administrative law ... runs aground when it encounters concerns of national security ... committed by law to the appropriate agency of the Executive Branch." *Department of Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 823–24, 98 L.Ed.2d 918 (1988). Thus, unless Congress has *specifically expressed* a contrary intention, the courts characteristically do not intrude upon the authority of the executive in military and national security affairs. *Egan*, 108 S.Ct. at 825. *See also e.g., Chappel v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), *Schlesinger v. Councilman*, 420 U.S. 738, 757–58, 95 S.Ct. 1300, 1312–13, 43 L.Ed.2d 591 (1975), *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973), *Burns v. Wilson*, 346 U.S. 137, 142, 73 S.Ct. 1045, 1048–49, 97 L.Ed. 1508 (1953), *Orloff v. Willoghby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

9. In *Mandel*, Judge Karlton granted the discovery motion and, on the issue of a whether such discovery impinges on a nonreviewable political question, stated:

> I need not decide if the political question doctrine governs the issue of whether the export of a given commodity is in fact detrimental to the foreign policy or national security interests of the United States. That question is not tendered in this case. Rather, given the Court's ruling above, the scope of the present inquiry extends only to whether there was any basis in fact for the Secretary's determinations. The considerations which give rise to a "political question" simply are not implicated by that limited inquiry.

*Id.* (citations omitted).[10]

For the foregoing reasons, the court finds that the placement decisions made under the AECA and the EAA are nonjusticiable pursuant to the political question doctrine. Having so found, however, the inquiry only begins. The court must next address whether denying the defendants' request to discover documents relating to the formulation of the lists under either the AECA or the EAA is a violation of the defendants' right to procedural due process under the fifth amendment.

### 2. Due Process

■ The court begins its due process analysis with an acute awareness of the rights of the accused and an unwavering resolve to guarantee a fair trial. Nonetheless, the Supreme Court has noted that, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *United States v. Hastings*, 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed. 2d 96 (1983). By its nature, due process requires a balancing of both individual and governmental interests,[11] and it is well settled that no governmental interest is more compelling than the security of the nation. *Haig v. Agee*, 453 U.S. 280, 307, 101 S.Ct. 2766, 2782, 69 L.Ed.2d 640 (1981); *see also Aptheker v. Secretary of State*, 378 U.S. 500, 509, 84 S.Ct. 1659, 1665, 12 L.Ed.2d

992 (1964). Thus, within the realm of national security, the courts have frequently adjusted the requisites of due process. *See Haig v. Agee*, 453 U.S. at 309, 101 S.Ct. at 2783; *Halperin v. Kissinger*, 807 F.2d 180, 187 (D.C.Cir.1986) (citation omitted). Accordingly, since procedural fairness is a function of the circumstances, and since both AECA and the EAA involve exceptional issues of national security, the present motion proffers its own unique calculus.

As noted *supra*, the Supreme Court has addressed a criminal defendant's procedural due process rights in the context of dissimilar administrative procedures. Specifically, the cases of *Estep v. United States*, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946), and *United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), are cited for the proposition that when an administrative proceeding plays a crucial role in the imposition of criminal sanctions, due process requires some form of judicial review.

In *Estep v. United States*, the defendant was indicted under § 11 of the Selective Training and Service Act for intentionally failing to submit to the draft. Defendant proffered the defense that he had been improperly classified as available for military service. The Court addressed the issue of whether the defendant's original classification was subject to judicial review and held that, despite the Act's silence on

---

*Mandel,* 696 F.Supp. at 517.

**10.** Similarly, in dicta, the Ninth Circuit recently stated:

> Congress has designated the Secretary as the coordinating official in the area of export administration. It would severely undermine the Secretary's authority if judges and juries in individual criminal proceedings were permitted to reverse licensing determinations. And it would convert the judicial system into a policy-making forum, one in which the judiciary possess significantly less expertise and resources than the Secretary. Congress did not intend this chaotic and potentially dangerous result.

*Spawr Optical,* 864 F.2d at 1473.

**11.** Although the due process clause of the fifth amendment guards against arbitrary and irrational government conduct, *see, e.g., Moore v. City of East Cleveland,* 431 U.S. 494, 499 n. 6, 97 S.Ct. 1932, 1935 n. 6., 52 L.Ed.2d 531 (1977);

*Nachman Corp. v. Pension Ben. Guaranty Corp.,* 592 F.2d 947, 958 (7th Cir.1979), *aff'd* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), due process necessarily embodies a flexible concept and its procedural requisites vary depending upon the circumstances. *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976); *Orloff v. Cleland,* 708 F.2d 372, 379 (9th Cir.1983). "Due process, unlike some legal rules, is not a technical conception with affixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961) (citation omitted). "No single model of procedural fairness, let alone a particular form of procedure is dictated by the Due Process Clause." *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 483, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982) (citation omitted); *Dash, Inc. v. Alcoholic Beverage Control Appeals Bd.,* 683 F.2d 1229, 1233 (9th Cir.1982) (citation omitted).

the issue of judicial review and regardless of the fact that the determinations under the Act were deemed "final", fundamental concepts of fairness mandated some form of review. The Court held that, although the term "final" could act to restrict the customary scope of review, fundamental concepts of fairness to the accused mandated a judicial determination of whether the board exceeded its jurisdiction by having no basis in fact for their induction classification. *Estep*, 66 S.Ct. at 427–28.

In *United States v. Mendoza–Lopez*, the Court applied its reasoning in *Estep* to the realm of immigration. In *Mendoza–Lopez*, defendants were indicted under 8 U.S.C. § 1326 of the Immigration and Nationality Act for illegally entering the country after a prior deportation. Defendants argued that the original deportation order was invalid inasmuch as the defendants were not adequately informed of their right to counsel and their right to apply for suspension of deportation. The Court addressed the issue of whether the federal court must always accept as conclusive the fact of the deportation order, even if the deportation proceeding was not conducted in conformity with due process. *Mendoza–Lopez*, 107 S.Ct. at 2153.

The Court began its inquiry by noting that neither the language nor the legislative history of § 1326 indicated congressional intent to permit a challenge to the validity of the prior deportation in the § 1326 proceeding. *Id.* However, the Court noted that the mere failure of the Act to evidence an intent by Congress to make the deportation order contestable did not end the inquiry. The Court held that the constitutional requirement of due process mandated some form of judicial review:

> Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of criminal sanc-

tion, there must be *some* meaningful review of the administrative proceeding. *Id.* at 2154. (emphasis original) (citations omitted).

Were the court to conclude that *Estep* and *Mendoza–Lopez* are directly analogous to the present case, it would compel the finding that due process and the political question doctrine were presently at odds. Additionally, the broad language of the ruling in *Mendoza–Lopez* might even suggest that, despite the factual and administrative differences of the present case, some sort of judicial review of the listing decisions is constitutionally mandated. However, "[i]t is a maxim, not to be disregarded, that the general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cohens v. Virginia*, 6 Wheat, 264, 399, 5 L.Ed. 257 (1821) (Marshall, C.J.). Thus, neither *Estep* nor *Mendoza–Lopez* necessarily control the present defendants' requests to challenge the validity of certain listing decisions taken under the AECA and the EAA.

To begin, although the instant discovery motion is an attempt to review documents pertaining to unreviewable administrative proceedings, the particular agency actions taken under the AECA and the EAA are functionally distinguishable in that they directly involve the nation's security. This distinction is present despite the national security implications of both the immigration policies dealt with in *Mendoza–Lopez* and the induction policies addressed by the Court in *Estep*.[12] Additionally, both cases present situations where, although the underlying policies may *affect* national security, the individual considerations involved in the administrative proceedings do not directly *involve* national security concerns. Thus, although the court is competent to

---

12. Indeed, the Supreme Court has noted that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v.*

*Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952). Furthermore, for reasons too obvious to discuss, the induction policies of Congress are similarly interconnected with national security concerns.

review purely administrative matters that influence national security—whether a previous deportation proceeding was in fact legal, whether the classification of an individual for the draft conformed in fact with routine statutory considerations—it is wholly incompetent to second guess the executive branch on whether a particular piece of technical hardware was correctly listed as having the requisite impact on world peace and national security.

Since due process is a function of both individual *and* governmental interests, the court, in its determination of what is fair under these particular circumstances, must consider the government's need to make criminal the unlicensed exportation of certain defense articles without the government thereby forfeiting its right to keep the underlying national security assessments secret. The court is loath to find that due process necessarily prohibits Congress from drafting a statute for the benefit of national security and world peace unless Congress is also willing to surrender documents which involve national security determinations.

Finding otherwise would force the political branches of government into a Hobson's choice: either make the penalties civil in nature or submit to a judicial review. Making the penalties civil would almost certainly prove impotent. In light of the enormous investment of time and money required to produce today's highly sophisticated defense articles, the threat of civil penalties alone would do nothing to prevent exports sanctioned by those hoping to avoid the costs of developing the technology they seek to obtain. That is, there does not exist a civil penalty severe enough to make the attempt not worth the risk. Alternatively, keeping the penalties criminal at the expense of submitting to a judicial review would, because such a review is inappropriate, merely begin the loop again. Due process does not necessitate this absurdity.

In addition to the unique national security implications of the present listing determination, the court perceives another, perhaps more important, basis for distinguishing these administrative actions from those

relied on by the defendants. Specifically, neither the AECA nor the EAA involve classifications which initially and directly affect individuals; rather, these particular procedures pertain to the classification of commodities. This was not the case in *Estep* and *Mendoza–Lopez.*

In *Estep,* the court dealt with a prior administrative procedure that engendered the qualification of an individual for the draft; that individual's subsequent failure to submit to induction resulted in his prosecution. Similarly, in *Mendoza–Lopez,* the Court dealt with a prior adjudicative procedure that resulted in the deportation of an individual pursuant to the determination that he was an illegal alien; that individual's subsequent re-entry resulted in his criminal prosecution. Such distinctions are important inasmuch as the convictions in both *Estep* and *Mendoza–Lopez* were dependent upon a determination which directly affected the defendant but which was ultimately in the control of the agency. The agency, then, by way of its prior administrative determination, had the power to bring a particular individual one step closer to conviction. The court is of the view that it is precisely this aggressive quality that causes a particular administrative procedure to play the "critical role" necessary for the defendants to secure a judicial review.

Unlike the administrative procedures found in *Estep* and *Mendoza–Lopez,* the listing determinations made under the AECA and EAA affect, at the outset, not individuals but commodities. The agency decisions are, with respect to a given individual, passive and remain so until they are willfully, intentionally, and knowingly violated. As such, the determinations do not play the elemental role necessary for due process to require review. As noted by the court in *United States v. Gregg,* 829 F.2d 1430, 1437 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988), requiring a license to export is "as simple a matter as forbidding a passenger to ride on a train without a valid ticket." Likewise, in terms of due process, denying discovery is as simple a matter as concluding that a person who is pushed off a cliff

has the right to ask why; a person who jumps does not. Present defendants allegedly jumped inasmuch as their guilt depends on the government showing that they willfully violated the licensing requirement. It would be a strange holding indeed to conclude that procedural due process is violated merely because a knowing and willful violator is denied the opportunity to contest the sensitive political determinations that he freely elected to ignore.

The Supreme Court's willingness to assess procedural due process differently when presented with a more passive administrative procedure is evidenced by its decision in *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). In *Yakus*, the defendants were convicted of selling beef at prices above those decreed by the Emergency Price Control Act—a wartime act which imposed criminal sanctions for its willful violation. Defendants sought judicial review of the underlying regulation, arguing that the price controls were invalid. The Supreme Court addressed the issue of whether the provisions of the Act, which denied defendants the opportunity to attack the regulation in their prosecution for its violation, deprived them of due process as guaranteed by the fifth amendment. *Id.* at 431, 64 S.Ct. at 670. The Supreme Court held that there was "no novel constitutional issue" presented by foreclosing the defendants' ability to attack the validity of the price

requirements during their prosecution for its violation. Due process was satisfied since the Act itself provided a means of testing the validity of the regulation by a prior, independent administrative proceeding. *Id.* at 444, 64 S.Ct. at 677.

In *Mendoza–Lopez*, the Supreme Court paused to address the importance of *Yakus* as the one case wherein the Court upheld a criminal conviction for the violation of an administrative regulation where the validity of that regulation could not be attacked during the criminal proceeding. The Court in *Mendoza–Lopez* defined its holding in *Yakus* as one motivated by the exigencies of wartime,[13] the fact that the Court dealt with the propriety of regulations rather than the legitimacy of an adjudicative procedure, and, most significantly, the fact that adequate judicial review of the validity of the regulation was available in another forum. *Mendoza–Lopez*, 107 S.Ct. at 2155, n. 15. The Court specifically left for another day the issue of whether, under different circumstances, it would be proper to use the results of an administrative ruling in such a way.

That day has now arrived.

Both the AECA and the EAA are designed to be largely self-correcting.[14] Although the EAA provides a means for applicants to challenge the listing of commodities by submitting a written declaration

---

13. For purposes of the present motion the court notes that the country is presently enjoying peace. However, "[h]istory eloquently attests that grave problems of national security and foreign policy are by no means limited to times of formally declared war." *Haig v. Agee*, 453 U.S. 280, 303, 101 S.Ct. 2766, 2780.

14. Both the AECA and the EAA contain numerous internal safeguards for the protection of those ultimately affected by the listing determinations. Under the AECA, the President's "[d]ecisions on issuing export licenses shall be made in coordination with the Director of the United States Arms Control and Disarmament Agency and shall take into account the Director's opinion as to whether the export of an article will [affect national security]." 22 U.S.C. § 2778(a)(2). "The President shall periodically review the items on the United States Munitions List to determine what items, if any, no longer warrant export controls under this section. The

results of such reviews shall be reported to the speaker of the House of Representatives and to the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate." 22 U.S.C. § 2778(f) (Supp.1988). Under the EAA, the identification of items for inclusion on the Commodity Control List is accomplished by the Secretary of Defense and other appropriate departments and agencies. 50 U.S.C. app. § 2404(c)(2). The denial of a license application is subject to the review of several agencies and once a denial is made, the applicant has the opportunity to respond in writing before a final determination is made. 50 U.S.C. app. § 2409(f)(2). Moreover, any person who, in the past, has exported a commodity that has become subject to a restriction may petition for a hardship exemption. 50 U.S.C. app. § 2408. Finally, the public is given an opportunity to comment on licensing decisions before they take effect. 50 U.S.C. app. § 2412(b).

with the Secretary concerning the commodity's foreign availability,[15] the feasibility of such a challenge, in light of the apparent difficulty of submitting effective documentation, makes the opportunity insignificant in terms of the present inquiry. Moreover, the AECA apparently does not provide any public means of challenging the eventual listing determinations.

Nonetheless, the court is not persuaded, presented as it is with such sensitive national security determinations, that congressional failure to provide for a significant public challenge is a crucial distinction. The fact that this is an administrative proceeding does not take away from the fact that the actions taken are also part and parcel of the President's position as Commander and Chief of the Armed Forces. U.S. Const., Art. II, § 2.[16] "[The President's] authority to classify and control access to information bearing on national security ... flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant." *Department of Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (citation omitted). Certainly, it cannot be held that the executive branch never has the power to impose criminal sanctions for the sake of national security unless its reveals the details of its determinations. A defendant tried for treason would not have the right to challenge the President's determination that a particular country qualified for enemy nation status. Accordingly, a defendant does not have a right to challenge the executive's determination that a particular commodity qualifies for export controls.

Merely because the present executive determinations are made under the framework of an administrative procedure does not automatically open the determinations to judicial review.

Thus, the court finds that congressional failure to codify a meaningful opportunity to challenge the listing determinations made under the AECA or EAA either before or after prosecution is not a violation of the defendants' constitutional rights. The fact that the listing determinations pertain to commodities, that a criminal violation under each act is dependent on willful, intentional and knowing conduct, and that the determinations themselves involve sensitive national security concerns distinguishes the acts from those addressed in the line of cases relied upon by the defendants and satisfies the requisites of due process.

Finally, the court is convinced that its ruling in no way foreshadows any meaningful reductions in the procedural requisites of due process which would ultimately threaten the constitutional rights of the accused. Specifically, the statutes before the court contain certain precautions so as to ensure that the eventual listings are confined to their original purpose. Moreover, the court's findings are limited to the unique administrative procedures before the court.[17]

For the foregoing reasons, and good cause appearing therefor,

IT IS HEREBY ORDERED that plaintiff's motion for reconsideration of the magistrates order denying discovery dated December 12, 1988, is GRANTED.

---

15. If the foreign availability of a given commodity is challenged by an applicant, the Secretary is to consider reasonable evidence, expert opinion based upon adequate factual information, or intelligence information. 50 U.S.C. app. § 2404(f)(3). "Evidence" is to include such items as foreign manufacturers' catalogues, brochures, or operation or maintenance manuals, articles from reputable trade publications, photographs, and depositions based upon eyewitness accounts. *Id.*

16. As the court noted in *Moller-Butcher*, 560 F.Supp. 550, "The power to classify goods on the CCL—and to restrict for export on national se-

curity grounds—can (and should) be turned over to the executive branch, as it has the dominant role in conducting foreign policy." *Id.* at 553. The same, of course, holds for the classifications made under the AECA.

17. "[I]t is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." *School District of Abington TP., PA. v. Schempp*, 374 U.S. 203, 308, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring).

IT IS FURTHER ORDERED that, upon reconsideration, said order is RE-AFFIRMED under the political question doctrine.

IT IS SO ORDERED.